MANSFIELD, Justice.
A generation ago, in Johnson v. Charles City Community Schools Board of Education, 368 N.W.2d 74, 79 (Iowa 1985), we observed that the “state has a clear right to set minimum educational standards for all its children and a corresponding responsibility to see to it that those standards are honored.” Yet we also concluded that a “court is without either the resources or the expertise necessary” to draft minimum educational standards for private religious schools. Id. at 80.
This case concerns Iowa’s standards for public schools. It asks us, in effect, to require the state to impose additional public school standards, urging that such action is both constitutionally and statutorily required.
Adhering to the lessons of the Johnson case, we decline the invitation. We hold that plaintiffs’ specific challenges to the educational policies of this state are properly directed to the plaintiffs’ elected representatives, rather than the courts. We find the plaintiffs have not stated claims for relief under article IX, division 2, section 3, article I, section 6, or article I, section 9 of the Iowa Constitution, or Iowa Code section 256.37 (2007).
Our decision does not foreclose future constitutional challenges to actions taken by state or local officials in the vital field of public education. We decide only that this case, brought by these plaintiffs, should not go forward because the factual allegations, even if proved, do not set forth a potential constitutional or statutory violation under the foregoing provisions.
Accordingly, we affirm the district court’s dismissal of the plaintiffs’ petition.
I. Facts and Procedural Background.
Because this case was decided on a motion to dismiss, our relevant point of reference is the plaintiffs’ petition. The plaintiffs’ first amended and substituted petition, which the district court ultimately dismissed, is twenty-three pages long. It includes a two-page summary, entitled “Nature of the Lawsuit,” as well as thirteen pages of “Factual Allegations.”
The sixteen named plaintiffs are students or parents of students who attended or currently attend public schools in the Davenport, Des Moines, or West Harrison Community School Districts. As explained by plaintiffs’ counsel at oral argument, plaintiffs’ position is that Iowa’s educational system is not adequately serving students in either the largest (e.g., Davenport and Des Moines) or the smallest (e.g., West Harrison) school districts. The case is not brought as a class action.
According to the initial summary contained in the petition, “[t]he quiet, ugly truth is that Iowa’s educational system is but a shadow of its glorious past and our leaders are whistling by its graveyard.” Plaintiffs allege that there exists a “disparity in educational outcomes [in Iowa] based upon where one goes to school” and there has been a “failure[] to provide similar educational opportunities for all of Iowa’s students.”
Plaintiffs have not named any local school officials as defendants. They have sued, rather, the State of Iowa, the Governor of Iowa, the Iowa Department of Education, and the Director of the Department. In their initial summary, plaintiffs allege that these statewide entities and officials “have failed to establish standards, failed to enforce any standards, failed to *6 adopt effective educator pay systems, and failed to establish and maintain an adequate education delivery system.”
In the ensuing factual allegations, plaintiffs allege that Iowa’s statewide laws and rules are “broad educational requirements and accreditation standards for schools within the State of Iowa.” They do not, in plaintiffs’ view, contain “specific, detailed information regarding the courses that schools must- provide or offer to [them] students nor do they set forth any details regarding the skills that must be attained by students at each grade level.” Repeatedly, plaintiffs criticize Iowa for the lack of “state-mandated standards.” They maintain that Iowa is the only state without any statewide academic standards. Plaintiffs also fault Iowa for not “providing specific testing of students at various educational levels and in a variety of subject matters like other states,” instead relying on the Iowa Test of Basic Skills (ITBS) and the Iowa Test of Educational Development (ITED).
This part of the petition refers to a number of reports and studies.[1] For example, plaintiffs note that according to Education Week’s Quality Counts 2008 report, Iowa received a “C” for educational performance.[2]
Plaintiffs also cite Iowa Department of Education statistics that, in their view, show how students attending the smallest school districts (less than 250 students) are disadvantaged. According to the Department’s 2007 Annual Condition of Education report, teachers in those districts have, on average, less experience, fewer advanced degrees, and more teaching assignments than their colleagues at the largest school districts, such as Davenport and Des Moines. Iowa Dep’t of Educ., The Annual Condition of Education at 47, 75, 76 (2007) [hereinafter The Annual Condition of Education], available at http:// edueateiowa.gov/index.php?option=com_ docman&task=cat_view&gid=646& itemid=1563. Unsurprisingly, according to the petition, students in the smallest districts also have fewer curriculum units available to them.[3] Id. at 112.
Additionally, students from Iowa’s smallest school districts receive, on average, lower ACT scores. In 2007, according to the Department of Education report, the average ACT composite score was 21.3 for students at districts in the lowest enrollment category (less than 250 students). Id. at 192. By contrast, the average ACT composite score was 22.5 for students attending districts in the largest enrollment category. Id. The petition notes, however, *7 that the national average ACT composite score was 21.2. Id. at 186. Thus, all categories of school districts in Iowa scored above the national average.[4]
Plaintiffs further allege that Iowa’s ranking in science and math is “consistently declining”; that Iowa “has continued to decline in the national rankings for math and reading proficiencies and other measures of student achievement”; that “Iowa ranks well below the national average for students taking gateway courses such as Algebra, Algebra 2 or Geometry”; that “Iowa ranks thirty-eighth in the nation for AP [Advanced Placement] test scores”; and that “[m]any Iowa students are not prepared to enter the workforce or post-secondary education without additional training or remediation when they graduate from high school.”
Some of the factual allegations concern “the circumstances of the plaintiffs.” These allegations do not actually discuss the plaintiffs individually, but rather their school districts. According to the petition, one of the districts, West Harrison, has approximately 500 students. (Thus, it does not fall into the smallest category of school district, i.e., less than 250 students, referenced earlier in the petition.) Among other things, plaintiffs allege that West Harrison had an average ACT composite score of 18.6 in 2006, nearly three and a half points below the average ACT score for all Iowa students; that only ten to twelve percent of West Harrison’s teachers have advanced degrees; that West Harrison does not have anyone on staff to assist high school students with college planning or other career counseling; and that classes at West Harrison do not adequately prepare students for a college level curriculum.
With regard to the Davenport school district, plaintiffs do not find fault with teacher experience, staffing, or class availability, but allege that its average composite ACT score in 2007 was 20.5. No allegations are made as to teacher experience, staffing, class availability, or ACT scores in the Des Moines school district. However, with respect to all three of the school districts, plaintiffs allege that the percentages of students found proficient in math and reading according to ITBS and ITED scores generally have ranged between fifty and seventy percent, a level that plaintiffs appear to believe is unsatisfactory.
The petition has two counts seeking relief. In Count I, plaintiffs request a declaratory judgment. They allege that education is a fundamental right or alternatively that the current education laws (“or lack thereof’) are “irrational, arbitrary, and capricious” and not “rationally related to a legitimate governmental interest.” They also allege that “some students are receiving a more effective education than other students based solely upon where the student resides.” They allege the defendants have “failed to establish and provide access to an effective education” by (1) “failing to establish educational standards,” (2) failing to enforce and utilize such standards, (3) “failing to implement a professional pay system for educators consistent with such standards,” (4) “failing to provide equal access,” and (5) “failing to develop an effective organizational and delivery system and failing to address or abolish the disparities among different school[ ] districts in Iowa.” They allege violations of the due process, equal protection, and education clauses of the Iowa Constitution and Iowa Code section 256.37.
Count II seeks an order of mandamus. It alleges similar failures on the part of the *8 defendants, but goes on to assert that these failures amount to a breach of duty and requests an order directing the defendants to provide an effective education.
Finally, plaintiffs’ prayer for relief seeks a declaration that the defendants have failed to provide an effective education in accordance with the due process, equal protection, and education clauses and Iowa Code section 256.37. It also requests an order of mandamus or permanent injunction directing the defendants to (1) undertake all suitable means to provide an effective education; (2) develop educational content and performance standards for all Iowa school districts which detail required course offerings, instructor capabilities, and testing requirements, among other things; (3) improve or develop state assessments; (4) develop and enforce professional development programs; (5) implement a career ladder to enhance recruitment and retention of quality teachers; (6) enforce the standards by identifying and enforcing consequences for failure to follow and implement such standards; (7) “develop educational management and governance arrangements to mitigate all procedural and structural impediments to an effective education”; and (8) “[cjlose the achievement gaps among the school! ] districts in Iowa.”
Plaintiffs’ original petition was filed April 3; their first amended and substituted petition on April 30. On June 21, 2008, the defendants filed a motion to dismiss. In their nine-page motion, the defendants argued: (1) all the constitutional claims raised a nonjusticiable political question; (2) the equal protection and due process claims failed to state a claim; (3) there is no private cause of action under section 256.37; (4) mandamus did not lie; (5) the Governor could not be sued; and (6) the Iowa Administrative Procedures Act was the exclusive means of obtaining review of acts or omissions by the Department of Education.
This motion was resisted on all grounds by plaintiffs; a hearing was held; and on November 21, 2008, the district court granted the defendants’ motion.
In a thoughtful sixteen-page ruling, the district court found the plaintiffs had stated claims for relief under the equal protection clause and the due process clause, but all their constitutional claims presented a nonjusticiable political question, and their statutory claim under section 256.37 failed because that provision does not afford a private right of action. The court also found the plaintiffs had not satisfied the prerequisites for seeking mandamus. The court dismissed the action in its entirety for these reasons, declining to reach the defendants’ remaining asserted grounds for dismissal. Plaintiffs appeal.
II. Standard of Review.
Our review of a district court ruling on a motion to dismiss is for correction of errors at law. Kingsway Cathedral v. Iowa Dep’t of Transp., 711 N.W.2d 6, 7 (Iowa 2006). “A motion to dismiss should only be granted if the allegations in the petition, taken as true, could not entitle the plaintiff to any relief.” Sanchez v. State, 692 N.W.2d 812, 816 (Iowa 2005). “A motion to dismiss admits the well-pleaded facts in the petition, but not the conclusions.” Kingsway Cathedral, 711 N.W.2d at 8.
III. Analysis.
A. Introduction. We begin our analysis of this case by discussing, briefly, what it is not. For one thing, this is not a school funding case. Plaintiffs do not allege that Iowa has a funding system that discriminates among school districts or even one that funds schools inadequately.[5] *10 Also, plaintiffs are not questioning any specific law, rule, or policy enacted or promulgated by any of the defendants. This is a case challenging government inaction, not government action. Further, the defendants are not alleged to have engaged in disparate treatment of anyone. Plaintiffs do not claim the defendants have a different policy or standard for different types or categories of schools.
Rather, the entire focus of plaintiffs’ lawsuit is on the defendants’ alleged “failure” to act on a statewide basis. More specifically, plaintiffs allege that the defendants have failed to establish statewide educational standards, assessments, and teacher training, recruitment, and retention programs. To be sure, plaintiffs claim they have been denied “equal access” as a result of these “failures,” but that is an *11 allegation of disparate impact, not disparate treatment. There is no allegation that the defendants, for example, have treated the West Harrison school district any differently from other, larger school districts. Simply stated, plaintiffs charge the defendants with not having affirmatively adopted policies that would eliminate existing discrepancies among districts, for example, as to average student test scores.
B. The Legal Issues Before Us. As we have indicated many times before, “we will uphold a district court ruling on a ground other than the one upon which the district court relied provided the ground was urged in that court.” Martinete v. Belmond-Klemme Cmty. Sch. Dist., 772 N.W.2d 758, 762 (Iowa 2009) (citations omitted); see also Fennelly v. A-1 Mach. & Tool Co., 728 N.W.2d 168, 177 (Iowa 2006); Emmert v. Neiman, 245 Iowa 931, 934, 65 N.W.2d 606, 608 (1954) (“We have held many times that in reviewing a ruling sustaining a motion to strike or dismiss, the same should be sustained if any of the grounds advanced are good, even though the one upon which the trial court based its ruling, is not.” (citations omitted)).
Here the defendants urged dismissal of the constitutional claims in the district court on the alternative grounds that they were nonjusticiable and that they failed to state a claim. Both parties had a full opportunity to brief (and did brief) those matters below. Although the defendants’ appellate brief does not specifically urge that we affirm on the basis of failure to state a claim if we find one or more of the claims justiciable, the defendants made that request at oral argument. The parties have provided their district court briefing to us, and neither side has suggested that further briefing is needed. In any event, because both grounds were duly raised before the trial court, we could affirm on either ground even if it were not argued to us. See Erickson v. Erickson’s Estate, 191 Iowa 1393, 1397, 180 N.W. 664, 665 (1920). The fundamental principle is one of fairness to the parties and the trial court. See DeVoss v. State, 648 N.W.2d 56, 62-63 (Iowa 2002). That fairness is assured so long as the grounds on which we are affirming were presented to the trial court so the trial court had an opportunity to rule on them and the opposing party had an opportunity to counter them if it felt it needed to do so. Cf. Principal Mut. Life Ins. Co. v. Charter Barclay Hosp., Inc., 81 F.3d 53, 56 (7th Cir.1996) (noting that it “would not be quite cricket” to decide a case on a ground that had not been raised at all by the appellee before oral argument of the appeal). Also, because the district court has already indicated that it believes the equal protection and due process claims would be sufficient if they were justiciable, a remand for it to rule again on the viability of those claims (assuming their justiciability) seems particularly unnecessary and would only prolong the proceedings.
In State v. Seering, 701 N.W.2d 655, 660-61 (Iowa 2005), we declined to reach several constitutional arguments that were presented to and not ruled upon by the district court, and that were also not presented to us. That was an appropriate exercise of our discretion, but it is a far cry from the present case. Here the parties not only briefed below whether the equal protection and due process claims should be dismissed for failure to state a claim, the district court also decided these questions. A remand for the district court to rule again on whether the plaintiffs have stated a claim therefore would serve no purpose. At oral argument, the plaintiffs did not object to this court’s considering whether they stated a claim, nor would such an objection have made sense.
Appellants and appellees stand in different positions because the appellant seeks *12 to overturn the judgment rendered below. See Ritz v. Wapello Cuty. Bd. of Supervisors, 595 N.W.2d 786, 789 (Iowa 1999) (stating that "[w]e have recognized ... a distinction between successful and unsuccessful parties for purposes of error preservation" (citations omitted)). Our rules provide that an appellee need not even file a brief in our court. See Iowa R.App. P. 6.903(3) (indicating that the appellee may waive filing a brief). The appellant, by contrast, must file a brief and is limited to the issues raised in that brief. See id. r. 6.903(2); Dilley v. City of Des Moines, 247 N.W.2d 187, 195 (Iowa 1976) (citing cases). Of course, we may choose to consider only grounds for affirmance raised in the appel-lee's brief, but we are not required to do so, so long as the ground was raised below. In recent years, we have even on occasion affirmed on •grounds not raised below. For example, in State v. Reyes, 744 N.W.2d 95, 99-100 (Iowa 2008), we affirmed on a statutory ground that was not raised either below or in the appellate briefs, until we invited supplemental briefing. In State v. Adams, we granted further review and invited supplemental briefing on an issue that had not been raised by either party either below or on appeal, and then rendered a decision on that issue. See Order for Supplemental Briefing, State v. Adams, 810 N.W.2d 365, 366 (Iowa 2012).
This appeal has been brought to us. The elected branches of our state government are currently engaged in an active debate about state educational policy. They are entitled to know whether this lawsuit may affect their policy choices. It would be an abnegation of our responsibility not to reach a legal question about the sufficiency of the plaintiffs' pleadings that was fully developed and decided by the district court.
Additionally, the political question grounds and the failure to state a claim grounds are interrelated. In either case, we assume the truth of the plaintiffs' factual allegations and determine whether, under those facts, the plaintiffs could be enti-tied to judicial relief.[6]
C. The Education Clause. We first consider plaintiffs' claims under article IX, division 2, section 3 of the Iowa Constitution.[7] In its entirety, this section reads as follows:
Perpetual support fund. Sec. 3. The General Assembly shall encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement. The proceeds of all lands that have been, or hereafter may be, granted by the United States to *13 this State, for the support of schools, which may have been or shall hereafter be sold, or disposed of, and the five hundred thousand acres of land granted to the new States, under an act of Congress, distributing the proceeds of the public lands among the several States of the Union, approved in the year of our Lord one thousand eight hundred and forty-one, and all estates of deceased persons who may have died without leaving a will or heir, and also such percent as has been or may hereafter be granted by Congress, on the sale of lands in this State, shall be, and remain a perpetual fund, the interest of which, together with all rents of the unsold lands, and such other means as the General Assembly may provide, shall be inviolably appropriated to the support of common schools throughout the state.
Iowa Const, art. IX, div. 2, § 3 (1857 original version) (emphasis added). The present controversy concerns the italicized first sentence above, which both parties refer to as “the education clause.”[8]
Plaintiffs contend the education clause imposes judicially enforceable obligations on Iowa’s legislature to promote education by “all suitable means.” Defendants counter that plaintiffs’ claims under the clause present a nonjusticiable political question. Otherwise stated, defendants maintain that the education clause reflects a grant of funding authority to the legislature, not a limit upon legislative policy in the field of education.
Constitutional provisions, like statutes, need to be read in context. See Iowa Elec. Light & Power Co. v. Inc. Town of Grand Junction, 221 Iowa 441, 463, 264 N.W. 84, 95 (1935) (Parsons, J., specially concurring) (“A Constitution should be construed as a whole, just like a statute.”). Article IX of the 1857 Constitution of the State of Iowa, entitled, “Education and School Lands,” was enacted in two divisions. The first division of article IX, captioned “Education,” established a state board of education and conferred on that board powers and duties relating to education policy. In particular, section 1 of that division provided, “The educational interest of the State, including Common Schools and other educational institutions, shall be under the management of a Board of Education-” Iowa Const, art. IX, div. 1, § 1. Section 8 authorized the board of education “to legislate and make all needful rules and regulations in relation to Common Schools,” although it also permitted the general assembly to “alter[ ], amend[ ] or repeal[ ]” the board’s acts, rules and regulations after they had been adopted. Id. art. IX, div. 1, § 8.
The second division of article IX, captioned “School Funds and School Lands,” sets forth provisions relating to the funding of education, especially through the sale of state-owned lands. Whereas the first division entrusted the “educational interest” to the board of education, the second division made clear that funding would be the legislature’s domain. Hence, the first section of the second division states, “[t]he educational and school funds and lands, shall be under the control and management of the General Assembly of this state.” Id. art. IX, div. 2, § 1.
The third section of the second division, wherein the education clause is found, is entitled “Perpetual support fund.” Id. art IX, div. 2, § 3. The clause itself then follows. The remaining language of this section, after the education clause, speaks in terms of “a perpetual fund, the interest of which, together with all rents of the unsold lands, and such other means as the General Assembly may provide, shall be inviolably appropriated to the support of Com *14 mon schools throughout the State.” Id. All this, we believe, supports a construction of the education clause as a funding provision, which allocated to the general assembly the authority to provide money for education, and thereby to “encourage [various forms of improvement] by all suitable means.” Id.
We discussed this dichotomy between education policy (covered by the first division of article IX) and education funding (the subject of the second division) at some length in District Township of the City of Dubuque v. City of Dubuque, 7 Clarke 262 (1858), decided just a year after the adoption of 1857 constitution. There we found unconstitutional a wide-ranging law enacted by the general assembly to provide for “the public instruction of the state of Iowa” on the ground that “[p]ower to legislate upon the subject of education, is conferred upon the board [of education]” and the legislature can only act in the realm of education policy to alter, amend, or repeal the board’s prior acts. Dist. Twp., 7 Clarke at 271-72, 285-86.[9] We emphasized that laws “which provide a system of education, sometimes known by the name of ‘school laws’ ... are to originate with the board[,]” whereas laws “for the levying of taxes — those making appropriations of money — and those for the control and management of the educational and school funds and lands — are to be passed by the general assembly.” Id. at 286.
A year later, in Clayton County High School v. Clayton County, 9 Iowa 175 (1859), reinforcing the lesson of the Du-buque case, we held the general assembly lacked constitutional authority to establish high schools. We specifically rejected the argument that such schools “may rightfully be provided for by the General Assembly, to whom is committed the duty of encouraging, by all suitable means, the promotion of intellectual, scientific, moral and agricultural improvement.” Clayton Cnty., 9 Iowa at 176. Instead we concluded that these schools were “a component part of the educational system of the State; the original establishment of which, as well as its subsequent management and control, has been committed by the constitution to the Board of Education.” Id. at 177. In short, at a time when the 1857 constitution was quite fresh in people’s minds, we reached the conclusion that no aspect of the Iowa Constitution, including the education clause, authorized the legislature to provide for public schools (as opposed to merely funding them). Since the contemporary view of our court was that the education clause did not even allow the legislature to establish public schools, it seems difficult for us to conceive that the clause could have been seen as a source of enforceable minimum standards for such schools.
This interpretation of the education clause as a grant of funding authority is *15 further confirmed by section 15 of the first division of article IX:
At any time after the year One thousand eight hundred and sixty three, the General Assembly shall have power to abolish or re-organize said Board of Education, and provide for the educational interest of the State in any other manner that to them shall seem best and proper.
Iowa Const, art. IX, div. 1, § 15. In short, section 15 of the first division authorized the general assembly to eliminate the board of education at any time after 1863 and thereafter provide for “the educational interest of the State in any other manner that to them shall seem best and proper.” Id. As it turned out, the legislature abolished the board of education at the earliest possible opportunity in 1864. See 1864 Iowa Acts ch. 52, § l.[10]
Placed in context, section 15 reaffirms the dividing line between the first division of article IX, which addressed education policy, and the second division, which identified funding sources. Section 15 made clear that the board of education would control education policy (subject to a possible legislative override) until at least 1863, but thereafter the legislature could take over that responsibility “in any other manner that to them shall seem best and proper.” Iowa Const, art. IX, div. 1, § 15.
One episode from the 1857 constitutional convention debates also suggests that our founders did not intend for section 3 of the second division to constrain the general assembly’s authority with respect to education policy. On March 3, 1857, George Ells of Davenport proposed amending that section to include a guarantee of a free public education. Specifically, he sought to add a clause at the end of the section so it would read, “shall be inviolably appropriated to the support of common schools throughout the state, in which tuition shall be without charge.” See 2 The Debates of the Constitutional Convention; of the State of Iowa 968 (W. Blair Lord reporter, Davenport, Luse, Lane & Co. 1857) [hereinafter Debates ] (emphasis added), available at http://www.statelibraryofiowa. org/services/Iaw-library/iaconst.
Elis’s proposal came under immediate criticism. J.C. Hall of Burlington objected that the issue of free public schools should be left “to be determined in the future, as the public exigencies may require.” Id. A.H. Marvin of Monticello observed:
We should not, in my opinion, be bound by a constitutional provision to make our common schools free to all, but should let the several districts regulate this matter for themselves. If we do that, I will warrant you that poor children will never be turned out of our common schools.
Id. at 969. Harvey Skiff of Newton commented, “If we should incorporate the provision of the gentleman from Scott [Mr. Ells] into our constitution, it would become established as organic law, which could not be repealed.” Id. Although another delegate (Rufus Clarke of Mt. Pleasant) spoke in favor of the amendment, it was quickly defeated by a vote of twenty-five to eight. Id. at 970-72.
This exchange indicates the delegates to the 1857 convention did not believe that section 3, as it was ultimately approved, contained a right to a free public education. And if section 3 did not assure a right to a free public education, it seems untenable to argue that section 3 contained a judicially enforceable right to a free public education with certain minimum standards of quality. Iowa’s constitutional *16 delegates had an opportunity to make a guarantee of free public education part of “organic law,” id. at 969, and declined to do so.[11]
Our decision in Kleen v. Porter lends further support to the view that the education clause does not constrain legislative policies in the field of education. 237 Iowa 1160, 28 N.W.2d 904 (1946). Kleen was a declaratory judgment action seeking to have declared unconstitutional two laws that appropriated money from the general fund to school districts on a targeted basis to reimburse certain transportation expenses and bring all districts up to a certain minimum level of per-pupil funding. 237 Iowa at 1161, 23 N.W.2d at 905. The petition asserted that under sections 3 and 7 of the second division of article IX, such appropriations could only be made on a uniform statewide basis in proportion to the numbers of youths between five and twenty-one years old in each district. Id.; see also Iowa Const, art. IX, div. 2, § 7 (“The money subject to the support and maintenance of common schools shall be distributed to the districts in proportion to the number of youths, between the ages of five and twenty-one years, in such manner as may be provided by the General Assembly.”).[12] We disagreed. We held that the enumeration requirement applied only to appropriations from the “permanent school fund” established by article IX, division 2, not other funding sources. Kleen, 237 Iowa at 1165-66, 23 N.W.2d at 907. We construed the first sentence of section 3— “The General Assembly shall encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement” — as designed to give the legislature “broad authority” to augment the income from the permanent school fund without being subject to the enumeration requirement in section 7. Id. at 1166, 23 N.W.2d at 907. Thus, Kleen saw the education clause as a grant of broad funding authority to the general assembly.
In sum, given the wording and location of the education clause in our constitution, and our prior interpretations of that clause, we do not believe plaintiffs have stated a claim thereunder. Plaintiffs’ criticisms of state education policy do not amount to a violation of article IX, division 2, section 3.
It is a well-established principle that the courts will not intervene or attempt to adjudicate a challenge to a legislative action involving a “political question.” Des Moines Register & Tribune Co. v. Dwyer, 542 N.W.2d 491, 495 (Iowa 1996); see also Powell v. McCormack, 395 U.S. 486, 518, 89 S.Ct. 1944, 1962, 23 L.Ed.2d 491, 515 (1969). The nonjusticia-bility of “political questions” is primarily rooted in the separation of powers doctrine, “which requires we leave intact the respective roles and regions of independence of the coordinate branches of government.” Dwyer, 542 N.W.2d at 495 (citations omitted).
The political question doctrine excludes from judicial review those controversies *17 which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of [the General Assembly] or the confines of the Executive Branch. The Judiciary is particularly ill suited to make such decisions, as courts are fundamentally underequipped to formulate [state] policies or develop standards for matters not legal in nature.
Japan Whaling Ass’n v. Am. Cetacean Soc’y, 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166, 178 (1986) (citations and internal quotations omitted). Nonetheless, the exercise of the judiciary’s power to interpret the constitution and to review the constitutionality of the laws and acts of the legislature does not offend these principles. Luse v. Wray, 254 N.W.2d 324, 327-28 (Iowa 1977); see also Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177-78, 2 L.Ed. 60, 73 (1803).
A political question may be found when one or more of the following considerations is present:
(1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving the issue; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court’s undertaking independent resolution without expressing a lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
Dwyer, 542 N.W.2d at 495 (citing Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663, 686 (1962)). Whether a matter involves a “political question” is determined on a case-by-case basis and requires an examination of the nature of the underlying claim. Id. at 495-96.
A number of these factors might support the conclusion that plaintiffs’ claim under the education clause presents a political question. To begin with, the text and history of the clause indicate a commitment of authority to the general assembly, rather than a constraint upon it. The clause says the “General Assembly shall encourage....” Unlike most of the clauses in our bill of rights, it is not worded in the negative as a prohibition (e.g., “the General Assembly shall not ... ”). See, e.g., Iowa Const, art. I, §§ 3-4, 6-9, 11-19, 21, 23-24. Moreover, as noted above, the education clause must be read in conjunction with the broad policy-making authority conferred by article IX, division 1, séction 15, which states that the general assembly shall have power after 1863 to “provide for the educational interest of the state in any other manner that to them shall seem best and proper.” Kinzer v. Dirs. of Indep. Sch. Dist., 129 Iowa 441, 444, 105 N.W. 686, 687 (1906) (citing this constitutional provision and stating that “the Legislature is expressly authorized to provide for the educational interests of the state, in such manner as shall seem best and proper”); see also Bunger v. Iowa High Sch. Athletic Ass’n, 197 N.W.2d 555, 563 (Iowa 1972) (same).
Second, it is an open question whether the education clause contains “judicially discoverable and manageable standards.” Dwyer, 542 N.W.2d at 495. The clause says that the legislature shall “encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement.” Iowa Const, art. IX., div. 2, § 3. Are courts to become arbiters of “moral improvement?” How are judges to decide that children are deficient in their moral upbringing and what to do about it? Of course, the clause does not *18 even contain the words “schools” or “education.” Does this mean that we as judges can order the state to foster moral improvement in adults? [13]
As we note above, most of the prior challenges to state education systems have been, in whole or in part, about funding. Courts are accustomed to dealing with questions of financial discrimination. See, e.g., State v. Dudley, 766 N.W.2d 606, 621-22 (Iowa 2009) (finding a denial of equal protection when indigent defendants represented by contract attorneys were required to pay more than indigent defendants represented by the public defender’s office). But this lawsuit asks the courts to enter into a longstanding debate over the merits of state mandates versus local control in public education. That may require an initial policy determination of a kind clearly for nonjudicial discretion. Dwyer, 542 N.W.2d at 495.
Lastly, we consider how other state courts have treated provisions in their state constitutions similar to Iowa’s education clause. Comparable language appears in the constitutions of California, Indiana, and Nevada. Cal. Const, art. IX, § 1 (“[T]he Legislature shall encourage by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement.”); Ind. Const, art. 8, § 1 (“[I]t shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement^]”); Nev. Const, art. 11, § 1 (“The legislature shall encourage by all suitable means the promotion of intellectual, literary, scientific, mining, mechanical, agricultural, and moral improvements!;.]”).[14] Only in Indiana has the state supreme court directly addressed justicia-bility.
In Bonner ex rel. Bonner v. Daniels, 907 N.E.2d 516, 518 (Ind.2009), a group of Indiana public school students sought a declaratory judgment to establish that the Indiana Constitution imposes an enforceable duty on state government to provide a standard of quality education and that the *19 duty was not being satisfied. Indiana’s Constitution provides:
Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all.
Ind. Const, art. 8, § 1 (emphasis added). The court noted that the clause “expresses two duties” — the first being “general and aspirational,” i.e., to encourage moral, intellectual, scientific, and agricultural improvement; the second being “more concrete,” i.e., to provide for free public schools open to all. Bonner, 907 N.E.2d at 520. In the court’s view “[jjudicial enforceability is more plausible as to the second duty than the first.” Id. Thus, the court found that this section required the legislature to establish free public schools, but “does not impose upon government an affirmative duty to achieve any particular standard of resulting educational quality. This determination is delegated to the sound legislative discretion of the General Assembly.” Id. at 522. Quoting an earlier case, the Indiana Supreme Court concluded that “ ‘determining the components of a public education is left within the authority of the legislative branch of government.’ ” Id. at 521-22 (quoting Nagy ex rel. Nagy v. Evansville-Vanderburgh Sch. Corp., 844 N.E.2d 481, 491 (Ind.2006)).
Asked at oral argument to furnish an example where an education clause similar to Iowa’s had been found justiciable, plaintiffs’ counsel cited Texas. See Edgewood Indep. Sch. Dist. v. Meno, 917 S.W.2d 717, 735-37 (Tex.1995) (holding that the Texas Constitution contains a justiciable standard with respect to education). But the Texas provision is worded quite differently: “[I]t shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools.” Tex. Const, art. VII, § 1. Other than the word “suitable,” the two clauses bear little similarity. The Texas Constitution expressly requires the support and maintenance of “an efficient system of public free schools.” Iowa’s requires only the “encourage[ment]” of “the promotion of intellectual, scientific, moral, and agricultural improvement.” Compare Iowa Const, art. IX, div. 2, § 3, with Tex. Const, art. VII, § 1. Adding the word “suitable” to either clause, or both, does not alter the basic contrast between an amorphous goal (“intellectual, scientific, moral, and agricultural improvement”) and a more specific one (“the support and maintenance of an efficient system of public free schools”). Id.
It bears emphasis that Iowa’s education clause, unlike the constitutions of most other states, does not mandate free public schools.[15] Nor does the education clause *21 require that the state’s public education system be “adequate,” “efficient,” “quality,” “thorough,” or “uniform.”[16] Our founders did not make these choices.
In the end, though, we need not decide today whether plaintiffs’ claims under the education clause present a nonjusticiable political question.[17] It is sufficient for present purposes to hold that Iowa’s edu *22 cation clause does not afford a basis for relief under the allegations in this case.
D. The Equal Protection Clause. We now turn to plaintiffs’ claim that the defendants have violated the equal protection clause of the Iowa Constitution.[18] Article I, section 6 provides:
All laws of a general nature shall have a uniform operation; the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens.
Iowa Const, art. I, § 6.
At the outset, we do not agree with the district court’s conclusion that plaintiffs’ equal protection claim presents a nonjusticiable political question. Typically, we decide claims brought by individuals who allege denial of their constitutional right to equal protection, even when the claim pertains to an area where the legislative branch has been vested with considerable authority. See, e.g., Luse, 254 N.W.2d at 328 (holding that an equal protection challenge to a general assembly election contest was justiciable notwithstanding the authority conferred by article III, section 7 to each house to determine such matters). Equal protection jurisprudence has a set of standards that we have applied in the past. Cf. Dwyer, 542 N.W.2d at 495 (discussing the elements of a nonjusticiable political question and treating a “lack of judicially discoverable and manageable standards” as one such element).[19] We therefore turn to the merits of plaintiffs’ equal protection claim.
We begin our discussion with Exira Community School District v. State, 512 N.W.2d 787 (Iowa 1994), a case where we *23 previously confronted both an equal protection and a substantive due process challenge relating to education (and reached the merits of the challenge). In that case, the Exira Community School District and Exira parent-taxpayers and students sued to invalidate a provision of the state’s open enrollment statute[20] that required the school district of residence to pay tuition to the district into which the student had open enrolled. Exira, 512 N.W.2d at 789-90. About ten percent of students living in the Exira district had open enrolled into another, larger school district (Audubon). Id. at 789. Because the financing mechanism required Exira to transfer funds, this had resulted in a substantial shortfall in available spending for the remaining Exira students and “financial trouble for the district.” Id. at 798-94. Although we found the Exira district itself lacked standing, id. at 790, we reached the merits of the equal protection and substantive due process challenges brought by the parent-taxpayers and students under both the U.S. and the Iowa Constitutions. We summarized their complaints as follows:
They believe the financing mechanism in section 282.18(8) is unreasonable because it requires a transfer of locally generated tax revenues without a showing of need. What the appellants want is a financing scheme that would require a showing that the receiving district “needs” the tax dollars more than the sending district. Otherwise — the appellants argue — a significant loss of students could ultimately destroy a sending district.
[[Image here]]
Appellants’ complaint boils down to this. Before open enrollment, the state had achieved through the financing formula educational equality for every student in Iowa. During the first year of open enrollment, Exira experienced a $70,000 loss in tax revenues necessary to educate the students remaining in the Exira school district. This resulted in a substantial disparity in funds available for education between Exira and Audubon. This disparity has disturbed the educational equality previously existing.
Id. at 793-94.
Significantly, the plaintiffs in Exira did not allege that the statute in question infringed upon a fundamental right. Id. at 793. Thus, for both equal protection and substantive due process purposes, we applied the rational basis test. Id. Quoting an earlier case, we held that when a statute bears “ ‘a definite, rational relationship to a legitimate purpose,’ ” it must be allowed to stand. Id. (quoting Kent v. Polk Cnty. Bd. of Supervisors, 391 N.W.2d 220, 225 (Iowa 1986)). This is true even if the reasonableness of the nexus to the purported end is only “ ‘fairly debatable.’ ” Id. Further, the challenging party must negate every reasonable basis upon which the statute may be sustained. Id.
Applying the rational basis test, we found that the financing mechanism “easily passes constitutional muster” because open enrollment results in greater access to educational opportunities and the legislature’s chosen method of financing open enrollment “maintains per pupil equity.” Id. at 795. Regarding the parent-taxpayers’ “relative need” argument, i.e., that the Exira district needed the money it was transferring to Audubon in order to survive, we commented, “In the final analysis, the appellants’ relative need argument is really all about a school district’s alleged due process right to exist.” Id. We then responded to this argument as follows:
If it chooses to do so, the legislature can — without constitutional impediment — terminate a school district’s exis *24 tence. And when the legislature enacted open enrollment legislation, it knew full well that its ultimate effect might mean the demise of some smaller schools. Despite this knowledge, the legislature made a policy decision — right or wrong — to go with open enrollment. It is not for us to judge the wisdom of such a policy. That was a legislative call.
In yielding the call to the legislative branch of government, we are not insensitive to the feelings and strongly-held views of patrons of smaller schools, such as the Exira school. We recognize that individuals and families sense a way of life is in the balance and vehemently challenge any assumption that centralization of schools improves the quality of education. The proper forum for this debate is however not in the courts, but in the other branches of state government. Our clear duty is to interpret and apply the law given to us, and not to develop or choose among schemes for public education.
Id. at 795-96.
At the end of our opinion, we turned specifically to the due process and equal protection claims of the Exira students. We rejected their substantive due process claim, observing, “We know of no authority that says a student’s desire to be educated in a certain school district [i.e., Exira] rises to the level of a right protected by due process.” Id. at 796. We added that a student has “a due process right to an adequate education,” but noted, “That right — as we have demonstrated [in our previous rational basis analysis] — is furthered, not diminished, by the funding mechanism in section 282.18(8).” Id. We also overruled the students’ equal protection challenge, stating: “Nor do we think such students are treated differently for equal protection purposes. We say this because section 282.18(8) assures every student roughly the same amount of funds for his or her education wherever that student is educated.” Id. In short, we concluded that the statute “does indeed have a rational basis,” which “disposes of’ both the equal protection and the substantive due process challenges. Id.
We believe several lessons can be drawn from Exira. First, we recognized that students have a due process right to an adequate education, although we did not characterize it as a fundamental right. Id. at 796. (The plaintiffs did not allege that a fundamental right was at issue in their case, id. at 793, and we accepted that position for purposes of our decision.) Second, we held there is no due process right to be educated in a particular school district. Id. at 796. Third, we found a funding mechanism that assured roughly the same amount of per-pupil funding regardless of the district did not treat students differently or violate equal protection. Id. Finally, we expressed the view that debates over whether “centralization of schools improves the quality of education” belonged in the legislature and not the courts. Id. at 795-96.
As an initial matter, we note that any equal protection claim, whether in the education context or elsewhere, requires an allegation of disparate treatment, not merely disparate impact. Indeed, plaintiffs’ counsel conceded as much at oral argument. To allege a viable equal protection claim, plaintiffs must allege that the defendants are treating similarly situated persons differently. Thus, in State v. Wade, we rejected an argument that a special sentence for both felony and misdemeanor sex offenders violated equal protection. 757 N.W.2d 618, 625 (Iowa 2008). We explained, “Even though Wade has identified two classes that are similarly situated, Wade’s equal protection argument fails because ... offenders who commit serious misdemeanor sex crimes and *25 offenders who commit felony sex crimes are not treated differently.” Id.; see also Ames Rental Prop. Ass’n v. City of Ames, 736 N.W.2d 255, 259 (Iowa 2007) (plaintiffs met this threshold by alleging that tenants who were related and tenants who were unrelated received differential treatment); Montoy v. State, 278 Kan. 769, 120 P.3d 306, 308 (2005) (holding that “disparate impact” of Kansas’s school financing scheme on minorities and other classes could not establish an equal protection violation).
A related way of saying the same thing is to point out that equal protection claims require “state action.” Disparate treatment by someone other than the state (which the state, because of its inaction, failed to prevent) generally does not amount to an equal protection violation. See Principal Cas. Ins. Co. v. Blair, 500 N.W.2d 67, 69-70 (Iowa 1993) (holding that the presence of an allegedly discriminatory family insurance clause in a private insurance policy did not violate either the Federal or the State Equal Protection Clause because this was “not an action of the state”).[21]
But as we have noted above, the petition contains no allegations of disparate treatment. Plaintiffs do not allege that the defendants have allocated fewer funds to students attending school districts like West Harrison, Davenport, and Des Moines, or that they have imposed different rules or requirements with respect to those districts. Plaintiffs’ theory, rather, is that the defendants have not taken sufficient affirmative steps to eliminate perceived differences in outcomes, e.g., gaps in average student achievement, teacher experience level, and the like. One can describe that theory in various ways, but it is not an allegation of disparate treatment by these defendants. See, e.g., City of Coralville v. Iowa Utils. Bd., 750 N.W.2d 523, 530-31 (Iowa 2008) (rejecting an equal protection challenge to a utility law that applied equally to all communities but with different results in different locales on the ground that it was “in substance a misplaced argument for uniformity of consequences rather than uniformity of operation”).[22] For this reason, plaintiffs’ equal protection claim was properly dismissed.
Even if we could discern some allegation of disparate treatment in plaintiffs’ allegations, we would still not be persuaded that they have stated a claim. Unless a suspect class or a fundamental right is at issue, equal protection claims are reviewed under the rational basis test. Sanchez, 692 N.W.2d at 817. Plaintiffs do not allege that- a suspect class is involved, but they claim that education is a fundamental right. For purposes of federal con *26 stitutional analysis, education is not a fundamental right. San Antonio Indep. Sell. Dist. v. Rodriguez, 411 U.S. 1, 85, 98 S.Ct. 1278, 1297, 36 L.Ed.2d 16, 44 (1973); see also Plyler v. Doe, 457 U.S. 202, 223, 102 S.Ct. 2382, 2398, 72 L.Ed.2d 786, 803 (1982) (“Nor is education a fundamental right; a State need not justify by compelling necessity every variation in the manner in which education is provided to its population.”).
This does not control the analysis under the Iowa Constitution. True, in Exira, we quoted from Rodriguez and relied on its reasoning. Exira, 512 N.W.2d at 794-95. In discussing that decision, we said, “Although important, education is not a fundamental right.” Id. at 794. But as we have noted, the Exira plaintiffs were not maintaining that the challenged law intruded upon a fundamental right. Id. at 793. Thus, we believe it remains an open question whether education is a fundamental right under the Iowa Constitution.
We have recently said,
[N] either this court nor the Supreme Court has created a clear test for determining whether the claimed right is a fundamental right.... [0]nly rights and liberties that are objectively “ ‘deeply rooted in this Nation’s history and tradition’ ” and “ ‘implicit in the concept of ordered liberty’” qualify as fundamental.
Hensler v. City of Davenport, 790 N.W.2d 569, 581 (Iowa 2010) (citation omitted) (quoting Chavez v. Martinez, 538 U.S. 760, 775, 123 S.Ct. 1994, 2005, 155 L.Ed.2d 984, 999 (2003)); accord Seering, 701 N.W.2d at 664 (declining to hold freedom of choice in residence to be a fundamental right even though it is “of keen interest to any individual”). Fundamental rights are generally those explicitly or implicitly contained in the Constitution. Plyler, 457 U.S. at 218 n. 15, 102 S.Ct. at 2395 n. 15, 72 L.Ed.2d at 799 n. 15; Sanchez, 692 N.W.2d at 817. We have traditionally followed the U.S. Supreme Court’s guidance in determining which rights are deemed fundamental. Seering, 701 N.W.2d at 664; In re Det. of Cuhbage, 671 N.W.2d 442, 447 (Iowa 2003). “Fundamental right” for purposes of constitutional review is not a synonym for “important.” Many important interests, such as the right to choose one’s residence or the right to drive a vehicle, do not qualify as fundamental rights. See Seering, 701 N.W.2d at 664; Sanchez, 692 N.W.2d at 817.
In Serrano v. Priest, 5 Cal.3d 584, 608-09, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971), the California Supreme Court relied on California’s similarly worded education clause as one — but by no means the only— supporting consideration for its conclusion that education was a fundamental right under the California Constitution. Article IX, section 1 of the California Constitution is entitled “Encouragement of education” and reads in its entirety as follows:
A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement.
Cal. Const, art. IX, § 1.
While California apparently borrowed some of this wording from the Iowa Constitution, see Crosby v. Lyon, 37 Cal. 242, 245 (1869), its education clause is essentially a stand-alone provision. In Iowa, by contrast, the education clause is the first sentence of a funding section entitled “Perpetual support fund” that, in turn, falls within a series of funding provisions. Iowa Const, art. IX, div. 2, § 3.
Contrasting with the reasoning of the California Supreme Court is that of the Indiana Supreme Court. In Bonner, the court affirmed the dismissal of the plain *27 tiffs’ state equal protection and due process claims, determining that there was no fundamental constitutional right to an adequate public education in Indiana. 907 N.E.2d at 522. The court reached this result despite the presence of an education clause similar to Iowa’s in the Indiana Constitution. The court noted that the clause “does not speak in terms of a right or entitlement to education” and that the Indiana Bill of Rights contains no reference to education. Id. The same is true in Iowa. The “Bill of Rights” and “Right of Suffrage” in the Iowa Constitution make no mention of education. See Iowa Const, arts. I, II.
We defer to another day the question whether education can amount to a fundamental right under the Iowa Constitution, thereby triggering heightened scrutiny. For present purposes, we conclude simply that the matters alleged in plaintiffs’ petition, even if true, do not amount to a deprivation of such a right. In Hen-sler, we recently acknowledged there is a fundamental parental right to exercise care, custody, and control over children. 790 N.W.2d at 581-82. Yet not all alleged infringements upon this right trigger strict scrutiny. Id. at 582. Rather, we required in Hensler that the challenged governmental action “directly and substantially intrude into [the parent’s] decision-making authority over her child.” Id. at 588. Similarly here, even if we assume there is a fundamental right to a basic education at some level, the plaintiffs’ allegations do not show a denial of that right. No plaintiff alleges anything specific to his or her (or his or her child’s) own actual education. Rather, them allegations are largely a hodgepodge of statistics. Some of these numbers relate to Iowa’s performance as a state and show a deterioration or decline in Iowa’s ranking or a below-average score. Others relate to ACT scores, reading proficiency, and math proficiency ratings in the Davenport, Des Moines, or West Harrison school districts. These data, in the plaintiffs’ view, demonstrate the need for more statewide standards and requirements. But even if all true, they do not amount to a deprivation of a fundamental right as to these plaintiffs.
In Exira, we commented that the proper forum for debate over school centralization is “not in the courts, but in the other branches of state government.” 512 N.W.2d at 796. In a way, this case involves another phase of the same debate. These plaintiffs want greater centralization — “state-mandated standards,” state-mandated “specific testing of students at various educational levels in a variety of subject matters,” and a state-mandated “professional pay system for educators.”
Because in this particular case the allegations do not show a deprivation of a fundamental right, even if we assume there is a fundamental right to education at some level, we apply the rational basis test. In previous discussions of both the Federal and the Iowa Equal Protection Clause, we have found a rational basis review applies when “‘social or economic legislation is at issue.’ ” Sanchez, 692 N.W.2d at 817 (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985)). This is when “ ‘the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.’ ” Id.; accord Midwest Check Cashing, Inc. v. Richey, 728 N.W.2d 396, 404-05 (Iowa 2007); Asmus v. Waterloo Cmty. Sch. Dist., 722 N.W.2d 653, 658 (Iowa 2006).
The rational basis test is a “deferential standard.” Ames Rental Prop. Ass’n, 736 N.W.2d at 259. Under this test, we must determine whether the classification is “rationally related to a legitimate governmental interest.” Id. The *28 classification is valid “unless the relationship between the classification and the purpose behind it is so weak the classification must be viewed as arbitrary or capricious.” Id. The government is not required or expected to produce evidence to justify its action. Id. To the contrary, the plaintiff “must negate every reasonable basis upon which the classification may be sustained.” Bierkamp v. Rogers, 293 N.W.2d 577, 579-80 (Iowa 1980); see also State v. Willard, 756 N.W.2d 207, 213 (Iowa 2008); Ames Rental Prop. Ass’n, 736 N.W.2d at 259.
Depending on the circumstances, a rational basis challenge can be resolved on a motion to dismiss. See, e.g., Sanchez, 692 N.W.2d at 817-20 (affirming the dismissal of equal protection and due process claims brought by undocumented aliens challenging the state’s refusal to issue driver’s licenses); Johnston v. Veterans’ Plaza Auth., 535 N.W.2d 131, 131-32 (Iowa 1995) (affirming dismissal of plaintiffs claim and rejecting plaintiffs contention that the thirty-day appeal timeframe contained in the statutory right to appeal a condemnation appraisement violated equal protection and due process because plaintiff “does not rebut” the possible basis for the distinction suggested by the defendant, “nor does he attempt to negate any other rational basis for the distinction”); Gard v. Little Sioux Intercounty Drainage Dist., 521 N.W.2d 696, 698-99 (Iowa 1994) (affirming the dismissal of a negligence action against drainage district including claim that immunity for district amounted to a denial of equal protection); Seivert v. Resnick, 342 N.W.2d 484, 485 (Iowa 1984) (affirming the grant of motion to dismiss by applying the rational basis test to reject a claim that an Iowa statute impermissibly distinguished among tortfeasors). Since the State does not have to produce evidence, and only a “plausible” justification is required, see Ames Rental Prop. Ass’n, 736 N.W.2d at 259, there are certainly occasions where a rational basis test can be applied on the pleadings without taking evidence. In this case, unless the well-pleaded facts (if true) would show that Iowa’s educational system is not rationally related to a legitimate state goal, there is no reason for the case to proceed further.
Disregarding plaintiffs’ legal conclusions (for example, that Iowa’s education system is “irrational, arbitrary and capricious” or that the defendants have failed to provide an “effective education”),[23] we are left with the following allegations: (1) Iowa has fewer state standards and requirements than other states (although it has some); (2) Iowa’s schools have a mediocre national ranking on some measures according to some sources; (3) the smaller school districts in Iowa on average have less experienced and ere-dentialed teachers and offer fewer classes; (4) three districts (Davenport, Des Moines, and West Harrison) have substantial percentages of students who are not demonstrating proficiency in reading and math according to certain standardized tests; and (5) one district (West Harrison) does not do a good job of preparing students for college. Plaintiffs attribute the last four points to the first — that is, they blame the lack of state-mandated standards in various areas for the undistinguished rankings on certain national score charts and the concerns noted with respect to smaller and larger school districts. But for purposes of the rational basis test, we need only find a reasonable relationship to a legitimate state purpose. See, e.g., Comm, for Educ. Rights, 220 Ill.Dec. 166, 672 N.E.2d at 1196 (affirming dismissal of complaint on this ground after applying rational basis *29 test and finding Illinois’s system for funding public education rationally related to the legitimate state purpose of local control).
We can conceive of a rational basis for the set of circumstances described by plaintiffs. The Iowa legislature may have decided that local school board autonomy is preferable in certain instances to state mandates. The legislature may also have concluded that it is more equitable to provide an equal or roughly equal amount of resources to each state school district, on a per capita basis, and then give those school districts the primary responsibility for determining how that money will be spent. See Iowa Code § 257.1(2) (providing that “each school district in the state is entitled to receive foundation aid in an amount per pupil equal to the difference between the per pupil foundation tax ... and the combined foundation base per pupil or the combined district cost per pupil, whichever is less”). The legislature may also have decided that it is important to preserve school districts in rural areas, even though the smaller size of those districts may not allow them to offer the same kinds of programs as larger districts. The legislature may have determined that time spent on standardized testing of students — and preparation for such tests — detracts from time spent in other areas of learning. Additionally, the legislature may have decided that school districts in Iowa are aware of their students’ math, and reading proficiency rates, but have many other pressing concerns, and that it would be best to defer to the judgment of local administrators regarding the areas that require the most attention.
Local control, equity in per-pupil funding, maintenance of existing rural school districts, and conservation of scarce classroom time and resources are all legitimate governmental interests. As claimed interests, they are “realistically conceivable.” Miller v. Boone Cnty. Hosp., 394 N.W.2d 776, 779 (Iowa 1986). Furthermore, the policies decried by the plaintiffs are at least rationally connected to these goals. While acknowledging the undeniable importance of education, our court has previously characterized it as an area where there is no true consensus and where needs change over time. Thus, we have said that “education is defined as a broad and comprehensive term with a variable and indefinite meaning.” In re Petty, 241 Iowa 506, 511, 41 N.W.2d 672, 675 (1950). We have also observed:
The establishment and the maintenance of an educational system through public schools is an indispensable obligation and function of the State of Iowa. It should be so maintained as to keep abreast with progress generally, and to meet the needs of the times. This applies not only to the courses of study but also to the teaching force. The policy with respect to either should not be an inflexible one.
Talbott v. Indep. Sch. Dist. of Des Moines, 230 Iowa 949, 967, 299 N.W. 556, 565 (1941). We cannot say that any state classification scheme identified by the petition is so arbitrary as to be unconstitutional.[24]
*30 In Racing Association of Central Iowa v. Fitzgerald (RACI), 675 N.W.2d 1, 15-16 (2004), we held that a statute taxing gross gambling receipts from racetracks at a rate nearly twice the rate imposed on gross gambling receipts from riverboats violated the Iowa equal protection clause. We find RACI readily distinguishable here. As noted, the plaintiffs do not point to anything the defendants have allegedly done to treat one group of Iowans different from another. Even if disparate treatment were alleged, RACI still only requires that the purported rational basis be “realistically conceivable” and have a “basis in fact”; it explicitly “does not require ‘proof in the traditional sense.” RACI, 675 N.W.2d at 7-8 & n. 4 (quoting Miller, 394 N.W.2d at 779). Providing equal resources to school districts while allowing those districts the independence to determine many aspects of educational policy is not merely “realistically conceivable” as a legislative purpose, it is the same legislative purpose we upheld in Exira.
RACI has not been the death knell for traditional rational basis review. Since RACI was decided, we have continued to uphold legislative classifications based on judgments the legislature could have made, without requiring evidence or “proof’ in either a traditional or a nontraditional sense. See Judicial Branch v. Iowa Dist. CL, 800 N.W.2d 569, 578-79 (Iowa 2011) (holding it was constitutional to remove deferred judgments but not dismissals and acquittals from the public docket and stating that “[t]he legislature could rationally determine that deferred judgments should not be accessible to the public but dismissals and acquittals should be”); State v. Mitchell, 757 N.W.2d 431, 438-39 (Iowa 2008) (upholding a law that distinguished between married and unmarried sex offenders and finding that “[t]he legislature could have reasonably determined its chosen classification scheme, which differentiates between cohabitants who are married and those who are unmarried, would rationally advance the government objective of protecting children from sex offenders”); Ames Rental Prop. Ass’n, 736 N.W.2d at 259 (upholding an ordinance limiting the number of unrelated persons who could live in a house because “[t]he City is not required or expected to produce evidence to justify its legislative action”).
While some members of this court have dissented from some of those decisions, claiming they are inconsistent with RACI, see Mitchell, 757 N.W.2d at 442 (Wiggins, J., dissenting), Ames Rental Property Ass’n, 736 N.W.2d at 264 (Wiggins, J., dissenting), they are precedents of this court. In fact, since RACI was decided, we have considered rational basis equal protection challenges under the Iowa Constitution many times and upheld such a challenge only once. See Dudley, 766 N.W.2d at 620-24 (upholding a rational basis challenge to the state’s reimbursement laws for indigent defense without affording either side an opportunity to present evidence). But see Timberland Partners XXI, LLP v. Iowa Dep’t of Revenue, 757 N.W.2d 172, 175-77 (Iowa 2008) (rejecting an equal protection challenge to an administrative rule providing that apartments would be taxed at a higher commercial rate and condominiums at a lower residential rate even if both were used for the same commercial purposes); State v. Willard, 756 N.W.2d 207, 213-14 (Iowa 2008) (finding residency restrictions for convicted sex offenders do not violate equal protection); City of Coralville, 750 N.W.2d at 530-31 (Iowa 2008) (rejecting equal protection challenge to a tariff system); In re Det. of Hennings, 744 N.W.2d 333, 339-40 (Iowa 2008) (finding no equal protection violation in denying a right to a bench trial in a sexually violent predator proceeding but not a criminal case); Midwest Check Cashing, Inc., 728 N.W.2d at *31 404-05 (finding a rational basis for different treatment of payday loans); Asmus, 722 N.W.2d at 658 (rejecting an equal protection challenge to a higher standard for legal causation in workers’ compensation mental injury cases); State v. Simmons, 714 N.W.2d 264, 276-78 (Iowa 2006) (holding that making only defendants who plead guilty eligible for a certain reduction in sentence does not violate equal protection); Sanchez, 692 N.W.2d at 817-19 (holding that denying driver’s licenses to illegal aliens does not violate equal protection); Claude v. Guar. Nat’l Ins. Co., 679 N.W.2d 659, 664-66 (Iowa 2004) (holding the statutory distinction between hit-and-run and miss-and-run vehicles for purposes of mandatory uninsured motorist coverage did not violate equal protection).
E. Substantive Due Process. Plaintiffs also allege the defendants have violated the due process clause of the Iowa Constitution, which provides that “no person shall be deprived of life, liberty, or property, without due process of law.” Iowa Const, art. I, § 9. For the reasons already discussed with respect to equal protection, we believe plaintiffs’ substantive due process claim is justiciable. We have a familiar analytical framework under which to analyze such claims, and we have reached the merits of such a claim in the field of education before. See Exira, 512 N.W.2d at 793-96.
Substantive due process prevents the government “ ‘from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.’ ” Zaber v. City of Dubuque, 789 N.W.2d 634, 640 (Iowa 2010) (quoting Atwood v. Vilsack, 725 N.W.2d 641, 647 (Iowa 2006)); State v. Hemandez-Lopez, 639 N.W.2d 226, 237 (Iowa 2002). With a substantive due process claim, we follow a two-stage analysis. Hensler, 790 N.W.2d at 580. First, we determine the nature of the individual right involved, then the appropriate level of scrutiny. Id. If the right at issue is fundamental, strict scrutiny applies; otherwise, the state only has to satisfy the rational basis test. Sanchez, 692 N.W.2d at 819-20. When the rational basis test applies, there need only be a “reasonable fit” between the legislature’s purpose and the means chosen to advance that purpose. Zaber, 789 N.W.2d at 640. We have said that “ ‘[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in th[e] field [of substantive due process].’ ” Sanchez, 692 N.W.2d at 819 (quoting Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1, 16 (1993)).
As we have already noted, the petition does not allege wrongful acts by the defendants. Instead, it asserts the defendants’ inaction has infringed upon plaintiffs’ rights. Generally, plaintiffs allege the State and its officials have failed to establish sufficient state-wide standards or failed to enforce and utilize such standards. Yet this court has indicated the purpose of substantive due process is to protect citizens when the government engages in actual conduct (i.e., governmental action) that infringes or interferes with rights. In re Det. of Hennings, 744 N.W.2d at 337 (“Governmental action violates principles of substantive due process when....”); Atwood, 725 N.W.2d at 647 (“Substantive due process principles preclude the government ‘from engaging in conduct....’” (citation omitted)); Sanchez, 692 N.W.2d at 819 (“Substantive due process ‘ “provides heightened protection against government interference with certain fundamental rights and liberty interests.” ’ ” (quoting Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 56 (2000))); Hemandez-Lopez, 639 N.W.2d at 238 (“We must then determine whether the government action *32 infringing... .”)■ We have previously expressed “serious doubt” about the viability of a substantive due process theory based on the notion that the government failed to act. Midwest Check Cashing, Inc., 728 N.W.2d at 404 n. 6.
Regardless, there is an additional reason why we conclude plaintiffs have not alleged facts that, if true, would amount to a denial of substantive due process. As we have already pointed out, we are not deciding today whether there is a fundamental right to a basic education embraced within the Iowa Constitution. If there is such a right, the plaintiffs have not alleged that they have been deprived of it. Therefore, the rational basis test applies.
Typically, when the rational basis test is involved, we evaluate that basis similarly for equal protection and due process purposes. Midwest Check Cashing, Inc., 728 N.W.2d at 405; Sanchez, 692 N.W.2d at 820 (concluding that “[f]or the reasons discussed in the equal protection analysis,” a statute meets the rational basis test and does not violate substantive due process). For the rational basis test to be met, there need only be a reasonable fit between the governmental interest and the means utilized to advance that interest. The legislature need not employ the best means of achieving that interest. Hensler, 790 N.W.2d at 584. The plaintiff by contrast must negate every reasonable basis upon which the government’s act may be sustained. Zaber, 789 N.W.2d at 640.
Our decision in Exira illustrates how the rational basis test works in practice. Applying that test, we found the financing provision of the open enrollment statute to be constitutional because it gave “access to educational opportunities” even though “its ultimate effect might mean the demise of some smaller schools.” Exira, 512 N.W.2d at 795-96. “It is not for us to judge the wisdom of such a policy. That was a legislative call.” Id. at 795. “Our clear duty is to interpret and apply the law given to us, and not to develop or choose among schemes for public education.” Id. at 796. In other words, the possibility that the financing provision could be counterproductive and lead to fewer educational opportunities (due to “the demise of some smaller schools”) was not relevant to a rational basis analysis.
For the reasons already discussed under equal protection, we believe the plaintiffs have not alleged facts that if true would establish a substantive due process violation. They have alleged certain aspects of Iowa’s K-12 educational performance, by some criteria, are mediocre or even below national averages. They have alleged Iowa has fewer statewide standards than other states. They have alleged some urban (Davenport and Des Moines) and rural (West Harrison) districts offer fewer services or, on average, have less favorable educational outcomes than other districts. These allegations undoubtedly raise important and legitimate concerns for education policymakers to consider. But they do not “shock the conscience” as representing abusive governmental conduct. See State ex rel. Miller v. Smokers Warehouse Corp., 737 N.W.2d 107, 111 (Iowa 2007) (stating that substantive due process “ ‘is reserved for the most egregious governmental abuses against liberty or property rights’ ” (quoting Blumenthal Inv. Trusts v. City of W. Des Moines, 636 N.W.2d 255, 265 (Iowa 2001))). According to the 2007 Department of Education report cited by plaintiffs in their petition, for 2005-06, Iowa ranked 37th nationally in per-pupil spending, rated substantially above the national average in NAEP fourth and eighth grade reading and mathematics achievement, and rated substantially above the national average in SAT and AP test scores. The Annual Condition of Education at 196, 201, 205, 245. Again, these statistics warrant consideration by edu *33 cation policymakers, but they do not rise to the level of a constitutional violation. We conclude that plaintiffs have not stated a claim for deprivation of substantive due process based on the defendants’ alleged failure to do more to advance the cause of public education in this state.[25]
In rejecting the plaintiffs’ constitutional claims, we emphasize again that this is not a case involving alleged disparities in education funding. Rather, the plaintiffs allege the defendants have a constitutional duty — enforceable by Iowa’s judiciary — to improve the quality of the education they are receiving. In the relatively few instances where such quality-based claims have been asserted and have advanced past a motion to dismiss in other states, that has occurred because the state’s founders enshrined a particular educational mandate in the state constitution. Thus, in Connecticut Coalition for Justice in Education Funding v. Réll, the Connecticut Supreme Court relied on a state constitutional provision guaranteeing a right to “free public elementary and secondary schools in the state.” 295 Conn. 240, 990 A.2d 206, 212 n. 1 (2010) (quoting Conn. Const, art. 8, § 1). As we have discussed, Iowa’s delegates voted down an analogous provision in 1857. Similarly, in Rose v. Council for Better Education, Inc., the Kentucky Supreme Court noted that Kentucky’s constitution included a constitutional mandate to “provide an efficient system of common schools throughout the state.” 790 S.W.2d 186, 189 (Ky.1989); see also Ky. Const. § 183. And in Abbeville County School District v. State, the South Carolina Supreme Court invoked a constitutional provision that, like Connecticut’s, requires the state’s general assembly to “provide for the maintenance and support of a system of free public schools open to all children in the State.” 335 S.C. 58, 515 S.E.2d 535, 539 (1999); see also S.C. Const, art. XI, § 3.
Whatever the merits of these other judicial interventions in education, Iowa’s constitution is different. As we have already discussed, it does not mandate that the legislature provide either “free public schools” or an “efficient system of common schools.” We are confronted with equal protection and due process challenges that should be resolved under a rational basis test. In Abbeville County School District, the South Carolina Supreme Court affirmed the dismissal of the plaintiffs’ equal protection cause of action under the South Carolina Constitution for failure to state a claim. 515 S.E.2d at 538-39; see also Comm, for Educ. Rights v. Edgar, 174 Ill.2d 1, 220 Ill.Dec. 166, 672 N.E.2d 1178, 1196 (1996) (affirming dismissal of equal protection claim brought under the Illinois Constitution and observing that “[wjhile the present school funding scheme might be thought unwise, undesirable or unenlightened from the standpoint of contemporary notions of social justice, these objections must be presented to the General Assembly”); Bonner, 907 N.E.2d at 522 (upholding dismissal of equal protection *34 and due process claims based on the Indiana Constitution); Fair Sch. Fin. Council of Okla., Inc. v. State, 746 P.2d 1135, 1150-51 (Okla.1987) (affirming grant of motion for judgment on the pleadings on the plaintiffs’ equal protection and due process claims under the Oklahoma Constitution after concluding “there is a rational basis to support the present school finance system”).
F. Iowa Code § 256.37. The plaintiffs also assert a statutory claim under Iowa Code section 256.37, which provides:
It is the policy of the state of Iowa to provide an education system that prepares the children of this state to meet and exceed the technological, informational, and communications demands of our society. The general assembly finds that the current education system must be transformed to deliver the enriched educational program that the adults of the future will need to have to compete in tomorrow’s world. The general assembly further finds that the education system must strive to reach the following goals:
1. All children in Iowa must start school ready to learn.
2. Iowa’s high school graduation rate must increase to at least ninety percent.
3. Students graduating from Iowa’s education system must demonstrate competency in challenging subject matter, and must have learned to use their minds well, so they may be prepared for responsible citizenship, further learning, and productive employment in a global economy.
4. Iowa students must be first in the world in science and mathematics achievement.
5. Every adult Iowan must be literate and possess the knowledge and skills necessary to compete in a global economy and exercise the rights and responsibilities of citizenship.
6.Every school in Iowa must be free of drugs and violence and offer a disciplined environment conducive to learning.
This law does not contain an express private right of action, so any cause of action must be implied. Typically, in determining whether a private right of action may be inferred from a statute, we consider four factors:
1. Is the plaintiff a member of the class for whose benefit the statute was enacted?
2. Is there any indication of legislative intent, explicit or implicit, to either create or deny such a remedy?
3. Would allowing such a cause of action be consistent with the underlying purpose of the legislation?
4. Would the private cause of action intrude into an area over which the federal government or a state administrative agency holds exclusive jurisdiction?
Marcus v. Young, 538 N.W.2d 285, 288 (Iowa 1995) (citing Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26, 36-37 (1975)). All four factors generally must weigh in favor of a private right of action for us to find such a right exists. Stotts v. Eveleth, 688 N.W.2d 803, 808 (Iowa 2004).
Here we agree section 256.37 was enacted for the plaintiffs’ benefit, in that many of them are Iowa public school students. But we conclude the second, third, and fourth factors listed above do not support a private right of action, and therefore hold plaintiffs’ claim under section 256.37 was properly dismissed.
Regarding the second Marcus/Cort factor, the language of section 256.37 does not indicate legislative intent to create a remedy. Rather, the section merely sets forth *35 a general statement of policy with six “goals” the “education system must strive to reach.” Iowa Code § 256.37 (emphasis added). The legislature specifically used the terms “goals” instead of more concrete language such as “standards” or “requirements.” Also, the legislature used the aspirational phrase “must strive to reach” instead of a more demanding phrase such as “must reach.” Id.
Furthermore, the wording of the goals themselves reflects a legislative purpose to make only a policy pronouncement. Throughout the statute, broad and sweeping language such as “all” and “every” is used. Id. The goals are thus utopian in nature. For example, the final goal states, “Every school in Iowa must be free of drugs and violence....” Id. Did the legislature intend to allow a student to bring suit whenever his or her school is not entirely “free of drugs and violence”? We think not.
The placement of section 37 within Chapter 256 of the Iowa Code also supports the proposition that it is simply a policy statement. Section 256.37 is located within subchapter I, entitled “General Provisions.” This subchapter generally describes education policy in Iowa and establishes the Department of Education. Many other sections within the same “General Provisions” subchapter also begin with the language, “It is the policy....” See, e.g., id. §§ 256.18, .38.
The third Marcus/Cort factor is also unmet here because allowing a private cause of action would be inconsistent with section 256.37’s purpose of delineating general goals for Iowa’s educational system. Permitting a private right of action under section 256.37 would likely unleash a multiplicity of future lawsuits that would transform aspirational goals into a series of specific mandates. Notably, section 256.37 was enacted as part of legislation that allowed the Department of Education to waive compliance with the minimum education standards for accredited schools under certain circumstances. See 1992 Iowa Acts ch. 1159, § 1.
In addition, the fourth factor is not satisfied because the Department of Education has jurisdiction under Iowa Code section 256.1 to act in a policymaking capacity and provide statewide supervision of education in the State of Iowa. Iowa Code § 256.1(1) (“The department of education is established to act in a policymaking and advisory capacity and to exercise general supervision over the state system of education .... ”). A private cause of action under section 256.37 would intrude into an area in which a state administrative agency, the Department of Education, already has exclusive jurisdiction.
Because neither the second, third, nor fourth elements of a private right of action is present here, we affirm the district court’s ruling that section 256.37 does not provide a private remedy.
Given our disposition of plaintiffs’ substantive claims, we need not reach defendants’ additional arguments that mandamus is not an appropriate remedy or that the Governor of Iowa is not a proper defendant.
IY. Conclusion.
We affirm the dismissal of plaintiffs’ first amended and substituted petition. We do not minimize the importance of the issues raised by the plaintiffs. But a respect for precedent and for our constitution requires that we stay out of this dispute. This court in its past decisions, from Kleen to Johnson to Exira, has historically deferred to the policy decisions made by the political branches of government in this area.[26]
*36 The sixteen parents and students who brought this suit clearly believe that Iowa’s schools would benefit if we had more student testing, more statewide standards, more statewide uniformity, and a performance-based pay system for teachers. These issues are currently being debated throughout our state. The debate participants include legislators, the governor, executive branch officials, school boards, teachers, parents, students, and taxpayers. We believe the democratic process is best suited for resolution of those debates and can best accommodate the competing concerns of the many interested parties.
As we said at the beginning of this opinion, we do not close the door to other actions alleging constitutional violations in the field of education. We uphold only the dismissal of this case.
AFFIRMED.
CADY, C.J., and WATERMAN and ZAGER, JJ., join this opinion. CADY, C.J., and WATERMAN, J., file separate concurring opinions. WIGGINS, J., files a dissenting opinion in which HECHT and APPEL, JJ., join.
APPEL, J., files a separate dissenting opinion in which HECHT, J., joins.

. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179, 193 (2007) (in ruling on a motion to dismiss, courts must ordinarily consider documents incorporated into the complaint by reference); Hallett Constr. Co. v. Iowa State Highway Comm'n, 261 Iowa 290, 295, 154 N.W.2d 71, 74 (1967) (highway specifications that were incorporated in the petition by reference were deemed part of the petition and could be considered in a default proceeding). Because this action was brought in 2008, the materials cited by plaintiffs date from 2008 or earlier.

. This was a middling performance, according to this source. The national average was a C. See Iowa — State Highlights 2008, Education Week’s Quality Counts (Editorial Projects in Educ. Research Ctr., Bethesda, Md.), 2008, at 2, available at http://www.edweek. org/ew/toc/2008/01/10/index.html.

.On the other hand, the 2007 report indicates that students at the smallest school districts benefit, on average, from much smaller class size. The Annual Condition of Education, at 122. For example, the relevant comparisons are 11.9 versus 20.5 students per class for kindergarten, 11.8 versus 21.4 per class for first grade, 13.1 versus 21.6 for second grade, and 13.7 versus 22.7 for third grade. Id.

. The 2007 report further reveals that Iowa's average ACT composite score of 22.3 was tied with Wisconsin for second place in the nation. Id. at 185.

. Approximately forty-one other state supreme courts have considered broad constitu *9 tional challenges to the state education system. The vast majority of these cases have been primarily concerned with the state’s method of funding education — i.e., allegations that funding is either inequitable, inadequate, or both. See Opinion of the Justices, 624 So.2d 107, 112 n. 5 (Ala.1993) (funding “a major focus of plaintiffs’ case”), abrogated by Ex parte James, 836 So.2d 813, 819 (Ala.2002) (ultimately finding challenge nonjusticiable); Matanuska-Susitna Borough Sch. Dist. v. State, 931 P.2d 391, 394 (Ak.1997) (challenge to Alaska's public school funding laws; summary judgment for the state upheld); Roosevelt Elementary Sch. Dist. No. 66 v. Bishop, 179 Ariz. 233, 877 P.2d 806, 815-16 (1994) (finding Arizona's system of funding public education unconstitutional under the Arizona Constitution); Lake View Sch. Dist. No. 25 v. Huckabee, 351 Ark. 31, 91 S.W.3d 472, 500 (2002) (finding Arkansas’s method of funding education violated the Arkansas Constitution) (mandate recalled on other grounds by Lake View Sch. Dist. No. 25 v. Huckabee, 355 Ark. 617, 142 S.W.3d 643 (2004) (per curiam) and Lake View Sch. Dist. No. 25 v. Huckabee, 362 Ark. 520, 210 S.W.3d 28 (2005)); Serrano v. Priest, 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929, 957-58 (1976) (holding California violated the California Constitution in its manner of financing public schools); Lobato v. State, 218 P.3d 358, 364 (Colo.2009) (allowing challenge to Colorado’s school financing system to proceed); Horton v. Meskill, 172 Conn. 615, 376 A.2d 359, 374-75 (1977) (holding that the state has a constitutional obligation to provide "substantially equal” free public education in terms of state funding); Coal, for Adequacy & Fairness in Sch. Funding, Inc. v. Chiles, 680 So.2d 400, 405-08 (Fla.1996) (upholding dismissal of lawsuit claiming that the state had failed to allocate adequate resources to public schools); McDaniel v. Thomas, 248 Ga. 632, 285 S.E.2d 156, 168 (1981) (rejecting challenge to Georgia’s system of financing public education); Idaho Sch. for Equal Educ. Opportunity v. State, 142 Idaho 450, 129 P.3d 1199, 1209 (2005) (affirming trial court’s conclusion that Idaho’s current method of funding as it related to school facilities violated the Idaho Constitution); Comm, for Educ. Rights v. Edgar, 174 Ill.2d 1, 220 Ill.Dec. 166, 672 N.E.2d 1178, 1196-97 (1996) (affirming dismissal of lawsuit challenging Illinois's system of financing public schools); Bonner ex rel. Bonner v. Daniels, 907 N.E.2d 516, 522-23 (Ind.2009) (holding that state public education finance scheme did not violate Indiana Constitution); Montoy v. State, 278 Kan. 769, 120 P.3d 306, 308 (2005) (reversing finding of equal protection violations but upholding district court finding that Kansas’s statutory scheme for funding the public schools violated a separate provision of the Kansas Constitution); Charlet v. Legislature, 713 So.2d 1199, 1207 (La.Ct.App.1998) (granting summary judgment upon finding the state follpwed constitutionally proscribed mechanisms for providing school funding); Sch. Admin. Dist. No. I v. Comm'r, Dep’t of Educ., 659 A.2d 854, 857 (Me.1995) (rejecting challenge to reductions in state education funding); Hombeck v. Somerset Cnty. Bd. of Educ., 295 Md. 597, 458 A.2d 758, 790 (1983) (holding that Maryland’s system of financing public education was not unconstitutional); Milliken v. Green, 390 Mich. 389, 212 N.W.2d 711, 720-21 (1973) (rejecting challenge to discrepancies in school funding resulting from Michigan's manner of financing public school education); Skeen v. State, 505 N.W.2d 299, 320 (Minn.1993) (holding Minnesota’s current method for funding the education system did not violate the Minnesota Constitution); Comm, for Educ. Equal. v. State, 294 S.W.3d 477, 495 (Mo.2009) (finding no constitutional violation in Missouri’s school funding formula); Columbia Falls Elementary Sch. Dist. No. 6 v. State, 326 Mont. 304, 109 P.3d 257, 263 (2005) (finding Montana's method of funding schools violates Montana’s constitutional mandate to provide “quality” schools); Helena Elementary Sch. Dist. No. 1 v. State, 236 Mont. 44, 769 P.2d 684, 690-91 (1989) (finding Montana's method of funding public schools unconstitutional under the Montana Constitution); Neb. Coal, for Educ. Equity & Adequacy v. Heineman, 273 Neb. 531, 731 N.W.2d 164, 183 (2007) (holding plaintiffs’ challenges to inadequate funding to present nonjusticiable political questions); Claremont Sch. Dist. v. Governor, 142 N.H. 462, 703 A.2d 1353, 1360 (1997) (finding the state's system crafted to fund public education to be unconstitutional); Abbott ex rel. Abbott v. Burke, 149 N.J. 145, 693 A.2d 417, 432-33 (1997) (holding funding provisions for regular education expenditures to be unconstitutional); Robinson v. Cahill, 62 N.J. 473, 303 A.2d 273, 295-98 (1973) (determining that New Jersey's method of funding education which relied on local taxation for approximately sixty-seven percent of public school costs and led to great disparities in dollar input per pupil violated the New Jersey Constitution); Bd. of Educ. v. Nyquist, 57 N.Y.2d 27, 453 N.Y.S.2d 643, 439 N.E.2d *10 359, 363-70 (1982) (holding New York’s school financing system does not violate the State or Federal Constitution); Hoke Cnty. Bd. of Educ. v. State, 358 N.C. 605, 599 S.E.2d 365, 390-91 (2004) (finding state's method of funding and providing for school districts violated the state constitution); Bismarck Pub. Sch. Dist. 1 v. State, 511 N.W.2d 247, 263 (N.D.1994) (failing to declare that the overall impact of the statutory method for distributing funding for education was unconstitutional under the state constitution); Bd. of Educ. v. Walter, 58 Ohio St.2d 368, 390 N.E.2d 813, 825-26 (1979) (finding "the General Assembly has not so abused its broad discretion in enacting the present system of financing education as to render the statutes in question unconstitutional”); Okla. Educ. Ass’n v. State ex rel. Okla. Legislature, 158 P.3d 1058, 1066 (Okla.2007) (holding challenges to state funding system presented non-justiciable political questions); Coal. for Equitable Sch. Funding, Inc. v. State, 311 Or. 300, 811 P.2d 116, 121-22 (1991) (holding the method of funding public schools did not violate Oregon’s Constitution); Danson v. Casey, 484 Pa. 415, 399 A.2d 360, 367 (1979) (finding the state’s financing scheme did not violate the Pennsylvania Constitution); City of Pawtucket v. Sundlun, 662 A.2d 40, 61-62 (R.I.1995) (upholding Rhode Island’s funding system); Richland Cnty. v. Campbell, 294 S.C. 346, 364 S.E.2d 470, 472 (1988) (holding system for financing and funding schools did not violate the South Carolina Constitution); Davis v. State, 804 N.W.2d 618, 641 (S.D.2011) (finding South Dakota's system of funding education did not violate the education clause of the South Dakota Constitution); Dean v. Coddington, 81 S.D. 140, 131 N.W.2d 700, 703 (1964) (upholding educational funding statute as constitutional); Tenn. Small Sch. Systems v. McWherter, 851 S.W.2d 139, 156 (Tenn.1993) (finding the state’s statutory funding scheme was unconstitutional); Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist., 176 S.W.3d 746, 754 (Tex.2005) (holding state public school finance system was constitutional); Brigham v. State, 166 Vt. 246, 692 A.2d 384, 397 (1997) (determining the state's system of financing public education violated the Vermont Constitution); Scott v. Commonwealth, 247 Va. 379, 443 S.E.2d 138, 141-42 (1994) (holding Virginia’s Constitution was not violated by the school funding system); Seattle Sch. Dist. No. 1 v. State, 90 Wash.2d 476, 585 P.2d 71, 105 (1978) (finding state's current school financing system to be unconstitutional); Vincent v. Voight, 236 Wis.2d 588, 614 N.W.2d 388, 415 (2000) (holding Wisconsin’s school finance system was constitutional); Campbell Cnty. Sch. Dist. v. State, 181 P.3d 43, 84 (Wyo.2008) (upholding state’s financing system as constitutional).
However, a few state supreme courts have favorably considered (at least for motion to dismiss purposes) claims that focus upon the quality of education, as opposed to funding. See Conn. Coal. for Justice in Educ. Funding, Inc. v. Rell, 295 Conn. 240, 990 A.2d 206, 210-11, 271 (2010) (holding the plaintiffs’ allegations that they had not received suitable educational opportunities stated cognizable claims in light of Connecticut’s constitutional mandate for "free public elementary and secondary schools”); Rose v. Council for Better Educ., Inc., 790 S.W.2d 186, 189 (Ky.1989) (holding that the Kentucky General Assembly had not complied with its constitutional mandate to "provide an efficient system of common schools”); Abbeville Cnty. Sch. Dist. v. State, 335 S.C. 58, 515 S.E.2d 535, 539-40 (1999) (holding that plaintiffs had stated a claim under the South Carolina Constitution’s education clause requiring that "the General Assembly shall provide for the maintenance and support of a system of free public education”).

. This case was originally argued in March 2010, before three current members joined this court. It was then reargued in June 2011. Even at the first oral argument, some of the questioning related to the merits of plaintiffs' claims, including the following questions taken from the recording:
I take it this is a bit of an attack on local control, correct me if I'm wrong?
Aren't you in essence saying that a local school board then would not have the authority to say: well we want to set our tax rates at a certain level; we are concerned about economic development in this rural setting, we don't want to get the taxes up high; we choose not to promote advanced placement courses and instead we want to have a broad based athletic program.
Supposing there were a uniform standard, number one wouldn't that pose a risk of a lower standard as the legislature considers what's uniform across the board that they want to bring the rural districts up and maybe the urban districts down?
Secondly, supposing that standard were established could a wealthier district then elect to apply a richer environment?
(Emphasis added.)

. Plaintiffs do not argue, either here or below, that they have claims under division I of article IX of the Iowa Constitution.

. We have not used that term previously in any case.

. Among the provisions which this court declared unconstitutional was a provision for schools segregated on the basis of race. See 1858 Iowa Acts ch. 52, § 30(4). Later, in Clark v. Board of Directors, 24 Iowa 266 (1868), we struck down the segregated schools of a particular school district. Our decision there was based on interpretation of language originally passed by the board of education in 1860 in the wake of the Dubuque decision and subsequently reaffirmed on several occasions by the legislature. Clark, 24 Iowa at 271-73. The language in question required "the instruction of youth between the ages of five and twenty-one years.” Id. at 271. We reasoned that this language prohibited the exclusion of persons of color from the common schools. Id. at 276. Our opinion cited section 12 of the first division of article IX- — one of the original constitutional provisions relating to the board — as providing authority for the board's 1860 enactment. Id. at 271. In this case, plaintiffs have not cited or relied upon section 12 or any of the other original constitutional provisions in the first division relating to the board of education.

. We are not called upon to decide in this case whether the abolition of the board of education gave the legislature plenary authority to address education policy or whether that authority is subject to any limits that previously applied to the board of education.

. Earlier in the convention, Marvin had proposed an amendment that would have provided, "And the legislature shall provide for raising funds sufficient so that schools shall be kept in each district at least six months in each year, which schools shall be free of charge and equally open to all.” 2 Debates, at 825. That amendment also was rejected, following a debate that had unfortunate racial overtones. Id. at 825-30.
Unlike the earlier Marvin amendment, the later Ells amendment was directed to section 3 of the second division. There is no indication in the debates that the Ells amendment was rejected for racial reasons. Id. at 968-72.

. This section was repealed by constitutional amendment in 1984.

. In Dickinson v. Porter, we rejected an equal protection challenge to a state law that funded a tax credit for certain agricultural lands. 240 Iowa 393, 35 N.W.2d 66 (1949). In finding that the law's classification rested on a reasonable basis, i.e., to "benefit and encourage agriculture,” we cited the education clause as an example of a state public policy to promote agriculture. Id. at 408-09, 35 N.W.2d at 76. The Dickinson case had nothing to do with education.

. The education clauses of the constitutions of Connecticut, Massachusetts, and New Hampshire are not similar to Iowa’s. They employ language that is both more forceful and more specific. Connecticut's clause provides, "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation." Conn. Const, art. 8, § 1. Massachusetts' clause states:
Wisdom, and knowledge, as well as virtue, diffused generally among the body of the people, being necessary for the preservation of their rights and liberties; and as these depend on spreading the opportunities and advantages of education in the various parts of the country, and among the different orders of the people, it shall be the duty of legislatures and magistrates, in all future periods of this commonwealth, to cherish the interests of literature and the sciences, and all seminaries of them; especially the university at Cambridge, public schools and grammar schools in the towns....
Mass. Const, pt. 2 ch. V, § 2 (emphasis added). New Hampshire’s provides:
Knowledge and learning, generally diffused through a community, being essential to the preservation of a free government; and spreading the opportunities and advantages of education through the various parts of the country, being highly conducive to promote this end; it shall be the duty of the legislators and magistrates, in all future periods of this government, to cherish the interest of literature and the sciences, and all seminaries and public schools ...
N.H. Const, pt. 2, art. 83 (emphasis added).

. See Alaska Const, art. VII, § 1 ("The legislature shall by general law establish and maintain a system of public schools open to all children of the State....”); Ariz. Const, art. XI, § 1 (“The legislature shall enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system....”); Ark. Const, art. 14, § 1 ("[Tjhe State shall ever maintain a general, suitable and efficient system of free public schools....”); Colo. Const, art. IX, § 2 ("The general assembly shall, as soon as practicable, provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state....”); Conn. Const, art. 8, § 1 ("There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation.”); Del. Const, art. X, § 1 ("The General Assembly shall provide for the establishment and maintenance of a general and efficient system of free public schools...."); Fla. Const, art. IX, § 1(a) ("It is ... a paramount duty of the state to make *20 adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education. ...”); Ga. Const, art. VIII, § I, para. I ("The provision of an adequate public education for the citizens shall be a primary obligation of the State of Georgia. Public education for the citizens prior to the college or postsecondary level shall be free and shall be provided for by taxation.”); Haw. Const, art. X, § 1 ("The State shall provide for the establishment, support and control of a statewide system of public schools free from sectarian control....”); Idaho Const, art. IX, § 1 ("[I]t shall be the duty of the legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools.”); Ill. Const, art. X, § 1 ("The State shall provide for an efficient system of high quality public educational institutions and services. Education in public schools through the secondary level shall be free.”); Ind. Const, art. 8, § 1 ("[I]t shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all.”); Kan. Const, art. 6, § 1 ("The legislature shall provide for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools, educational institutions and related activities which may be organized and changed in such manner as may be provided by law.”); Ky. Const. § 183 ("The General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State.”); La. Const, art. VIII, § 1 ("The legislature shall provide for the education of the people of the state and shall establish and maintain a public educational system.”); Me. Const, art. VIII, pt. 1, § 1 ("[T]he Legislature are authorized, and it shall be their duty to require, the several towns to make suitable provision, at their own expense, for the support and maintenance of public schools_”); Md. Const, art. VIII, § 1 ("The General Assembly, at its First Session after the adoption of this Constitution, shall by Law establish throughout the State a thorough and efficient System of Free Public Schools; and shall provide by taxation, or otherwise, for their maintenance.”); Mich. Const, art. VIII, § 2 ("The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law.”); Minn. Const, art. XIII, § 1 ("The stability of a republican form of government depending mainly upon the intelligence of the people, it is the duty of the legislature to establish a general and uniform system of public schools. The legislature shall make such provisions by taxation or otherwise as will secure a thorough and efficient system of public schools throughout the state.”); Mo. Const, art. IX, § 1(a) ("[T]he general assembly shall establish and maintain free public schools for the gratuitous instruction of all persons in this state within ages not in excess of twenty-one years as prescribed by law.”); Mont. Const, art. X, § 1 ("The legislature shall provide a basic system of free quality public elementary and secondary schools.”); Neb. Const, art. VII, § 1 ("The Legislature shall provide for the free instruction in the common schools of this state of all persons between the ages of five and twenty-one years.”); Nev. Const, art. 11, § 2 ("The legislature shall provide for a uniform system of common schools, by which a school shall be established and maintained in each school district at least six months in every year_”); N.J. Const, art. VIII, § 4, ¶ 1 ("The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years.”); N.M. Const, art. XII, § 1 ("A uniform system of free public schools sufficient for the education of, and open to, all the children of school age in the state shall be established and maintained.”); N.Y. Const, art. XI, § I ("The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated."); N.C. Const, art. I, § 15 ("The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right.”); id. art. IX, § 2(1) ("The General Assembly shall provide ... for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students.”); N.D. Const, art. 8, § 1 ("[T]he legislative assembly shall make provision for the establishment and maintenance of a system of public schools which shall be open to all children of the state of North Dakota and free from sectarian control."); Ohio Const, art. VI, § 3 ("Provision shall be made by law for the or *21 ganization, administration and control of the public school system of the state supported by public funds...."); Or. Const, art. VIII, § 3 ("The Legislative Assembly shall provide by law for the establishment of a uniform, and general system of Common schools."); Pa. Const, art. Ill, § 14 ("The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth."); S.C. Const, art. XI, § 3 ("The General Assembly shall provide for the maintenance and support of a system of free public schools open to all children in the State....”); S.D. Const, art. VIII, § 1 ("[I]t shall be the duty of the Legislature to establish and maintain a general and uniform system of public schools wherein tuition shall be without charge, and equally open to all; and to adopt all suitable means to secure to the people the advantages and opportunities of education.”); Tenn. Const, art. XI, § 12 ("The General Assembly shall provide for the maintenance, support and eligibility standards of a system of free public schools.”); Tex. Const, art. VII, § 1 ("A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools.”); Utah Const, art. X, § 1 ("The Legislature shall provide for the establishment and maintenance of the state's education systems including; (a) a public education system, which shall be open to all children of the state_”); Vt. Const, ch. II, § 68 ("[A] competent number of schools ought to be maintained in each town unless the general assembly permits other provisions for the convenient instruction of youth.”); Va. Const, art. VIII, § 1 ("The General Assembly shall provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth, and shall seek to ensure that an educational program of high quality is established and continually maintained.”); Wash. Const, art. 9, § 1 ("It is the paramount duty of the state to make ample provision for the education of all children residing within its borders-”), § 2 ("The legislature shall provide for a general and uniform system of public schools.”); W.Va. Const, art. XII, § 1 ("The Legislature shall provide, by general law, for a thorough and efficient system of free schools.”); Wyo. Const, art. 7, § 1 ("The legislature shall provide for the establishment and maintenance of a complete and uniform system of public instruction, embracing free elementary schools of every needed kind and grade_”).

. See Ariz. Const, art. XI, § 1; Ark. Const, art. 14, § 1; Colo. Const, art. IX, § 2; Del. Const, art. X, § 1; Fla. Const, art. IX, § 1(a); Ga. Const, art. VIII, § 1; Idaho Const, árt. IX, § 1; Ill. Const, art. X, § 1; Ky. Const. § 183; Md. Const, art. VIII, § 1; Minn. Const, art. XIII, § 1; Mont. Const, art. X, § 1(3); Nev. Const, art. 11, § 2; N.J. Const, art. VIII, § 4, ¶ 1; N.M. Const, art. XII, § 1; N.C. Const, art. IX, § 2(1); Or. Const, art. VIII, § 3; Pa. Const, art. Ill, § 14; Tex. Const, art. VII, § 1; Va. Const, art. VIII, § 1; Wash. Const, art. 9, § 2; W.Va. Const, art. XII, § 1; Wyo. Const, art. 7, § 1.

. Although we interpreted the meaning of the education clause in Kleen, that does not foreclose the possibility that the claims now before us raise a political question. Kleen involved a question of legislative spending authority. 237 Iowa at 1161, 23 N.W.2d at 905. We interpreted the education clause as a grant of “broad authority” to the legislature. Id. at 1166, 23 N.W.2d at 907. This case involves the question whether the education clause provides justiciable rights and thus limits the legislature.
There is a political question doctrine in Iowa as elsewhere. See, e.g., Dwyer, 542 N.W.2d at 495-96; State ex rel. Turner v. Scott, 269 N.W.2d 828, 831-32 (Iowa 1978). Sometimes, "doing our job" involves recognizing that the clause in question delegates authority to another branch of government. But we defer to another day whether claims by public school students and parents under the education clause relating to the quality of their education present a nonjusticiable political question.

. We have regularly referred to article I, section 6 as the "equal protection clause” of the Iowa Constitution. See, e.g., Rojas v. Pine Ridge Farms, L.L.C., 779 N.W.2d 223, 229 (Iowa 2010); War Eagle Vill. Apartments v. Plummer, 775 N.W.2d 714, 723 (Iowa 2009); Varnum v. Brien, 763 N.W.2d 862, 872 (Iowa 2009); State v. Wade, 757 N.W.2d 618, 621 (Iowa 2008); State v. Mitchell, 757 N.W.2d 431, 435 (Iowa 2008); Timberland Partners XXI, LLP v. Iowa Dep’t of Revenue, 757 N.W.2d 172, 173-74 (Iowa 2008); Houck v. Iowa Bd. of Pharmacy Exam’rs, 752 N.W.2d 14, 21 (Iowa 2008); In re Det. of Hennings, 744 N.W.2d 333, 338-39 (Iowa 2008); Ames Rental Prop. Ass’n v. City of Ames, 736 N.W.2d 255, 261 (Iowa 2007); In re S.A.J.B., 679 N.W.2d 645, 648 (Iowa 2004). On a few occasions, none more recent than 2001, we have referred to it as the "privileges and immunities clause.” See Perkins v. Bd. of Supervisors, 636 N.W.2d 58, 71 (Iowa 2001); UtiliCorp United Inc. v. Iowa Utils. Bd., 570 N.W.2d 451, 455 (Iowa 1997); Bennett v. City of Redfield, 446 N.W.2d 467, 474 (Iowa 1989); Koch v. Kostichek, 409 N.W.2d 680, 683 (Iowa 1987).
While labels should not affect the underlying analysis, it is important to recognize that article I, section 6, like the Federal Equal Protection Clause, deals with equality and uniformity — i.e., laws "of a general nature” having "a uniform operation” and the legislature not granting privileges to a citizen or class of citizens that "upon the same terms [do] not equally belong to all citizens.” In this respect, it resembles the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. By the same token, it differs dramatically from the Privileges and Immunities Clause of the Fourteenth Amendment to the U.S. Constitution which by its terms protects certain privileges and immunities of "citizens of the United States” from being . abridged by the states. U.S. Const, amend. XIV, § 1. The Fourteenth Amendment Privileges and Immunities Clause shields certain rights of national citizenship from state interference. Saenz v. Roe, 526 U.S. 489, 501-504, 119 S.Ct. 1518, 1525-27, 143 L.Ed.2d 689, 704-05 (1999).

. We are not holding that a claim under the equal protection clause can never present a nonjusticiable political question. See, e.g., Vieth v. Jubelirer, 541 U.S. 267, 281-306, 124 S.Ct. 1769, 1778-92, 158 L.Ed.2d 546, 560-76 (2004) (stating the view of four Justices that partisan gerrymandering claims under the Federal Equal Protection Clause and other U.S. constitutional provisions constitute a nonjusticiable political question).

. The provision is now found at Iowa Code section 282.18(7).

. This is not imposing an "intent” requirement. We are not saying the State needs to have intentionally discriminated against students from West Harrison, or Davenport, or Des Moines, for example. But the State must have done something that treats these students differently from other students, as opposed to merely having failed to enact statewide standards and requirements favored by the plaintiffs. In a disparate funding case, the unequal funding can itself constitute the denial of equal protection, but plaintiffs do not allege there are any discrepancies of funding in Iowa.

. Plaintiffs allege that they are being denied "equal access” to education, but these catchwords obscure a critical point. Nothing in the petition alleges that the defendants (i.e., the state government and state officials of Iowa) have passed any law, adopted any regulation, or undertaken any measure that treats students differently from one district to another. To the contrary, plaintiffs fault the defendants for not implementing statewide standards that would affirmatively eradicate district-to-district differences- — e.g., in average student performance or average teacher qualification. "Failure to equalize differences” is not the same as treating people differently.

. If there is a constitutional right to an "effective education,” then alleging that the defendants have failed to provide such an education amounts to a mere legal conclusion.

. In Midwest Check Cashing, Inc., the plaintiff brought an equal protection challenge to a state law that limited payday loans but allegedly did not limit them enough. 728 N.W.2d at 403 ("these limitations are not as protective as Richey would like”). We expressed "serious [ ] doubt” that the plaintiff had shown sufficient state action for equal protection or substantive due process purposes or that she had been sufficiently classified for equal protection purposes. Id. at 404 n. 6. In any event, we found the law met the rational basis test. Id. at 404-05. This case is somewhat similar, in that plaintiffs are complaining about the state’s failure to act, not state action itself. As we have already discussed, we do not believe the petition alleges actual disparate treatment by the state government as is necessary for an equal protection claim, but even if it did, the facts alleged do not demonstrate the absence of a rational basis.

. We believe the only relevant due process concept here is one of substantive due process, not procedural due process. Procedural due process requires that certain procedures be afforded (e.g., notice and an opportunity to be heard) before the government deprives a citizen of a liberty or property interest. Smokers Warehouse Corp., 737 N.W.2d at 111. The plaintiffs are not complaining about the procedures by which educational laws and requirements have been enacted in Iowa or applied to themselves. They do not dispute that those policy choices have been made democratically by the people’s elected representatives in the legislative and executive branches. Their quarrel is with the substance of Iowa's educational policies. Id. (holding that where the plaintiffs do not clearly identify the nature of their due process claim, “we assume it is a substantive due process argument because they do not discuss any notice or hearing deficiencies”).

. We do not think a resolution of this case requires us to review the history of education *36 generally or what past Iowa governors have said on the subject. We are judges, not historians. For judges, some history, such as our own precedent, is highly relevant. But there are risks when we draw on political history as source material for judicial decisionmaking. One risk is that we may unwittingly diminish the importance of more relevant historical events, such as the ratification debates on the Iowa Constitution, by submerging them in other political history that has only background importance. Another risk is that political trends might then be used to justify the outcome in a particular case. It is not surprising to us that Iowa's governors have believed education to be a critical responsibility of government. But demonstrating that education has been a vital concern of the political branches of government does not answer the present question whether this particular case ought to proceed through the judicial branch.