# IN THE COURT OF APPEALS OF IOWA

No. 23-1788
Filed February 19, 2025

**JACOB M. ROSE, Individually and as Executor of the Estate of Jack F. Rose and JEREMY P. ROSE, Individually,**
    Plaintiffs-Appellants,

**vs.**

**OAKLAND HEALTHCARE MANAGEMENT, LLC, d/b/a OAKLAND MANOR,**
    Defendant-Appellee.
_____

    Appeal from the Iowa District Court for Pottawattamie County, Amy Zacharias, Judge.

    Plaintiffs appeal the district court's grant of summary judgment. **AFFIRMED.**

    Jon H. Johnson of Johnson Law, P.L.C., Sidney, for appellants.

    Jeff W. Wright and Zackary A. Martin, Heidman Law Firm, Sioux City, for appellee.

    Considered by Tabor, P.J., and Greer and Schumacher, JJ.

**SCHUMACHER, Judge.**

The application of Iowa Code chapter 686D (2022) and its exceptions are presented to this court as a matter of first impression. Jack Rose's sons—Jacob and Jeremy Rose (the Roses), individually and as one executor of Rose's estate—brought this action for the wrongful death of Rose against Oakland Healthcare Management, LLC, d/b/a Oakland Manor. The Roses allege Oakland, a skilled nursing care facility, acted recklessly in failing to properly implement COVID-19 safety protocols. The district court granted summary judgment for Oakland after concluding Iowa Code section 686D.6 precluded the Roses' claim.

## I.     Background Facts and Prior Proceedings

Rose began his residency at Oakland Manor, located in Oakland, Iowa, on February 15, 2019, due to his need for a level of skilled care his wife could not provide.[1] In March 2020, the Centers for Disease Control and Prevention (CDC) and other public health organizations declared COVID-19 a national emergency. Rose tested negative for COVID-19 on July 7 and July 10, 2020. He attended off-site medical appointments on July 10 and July 13. In accordance with Oakland Manor's implementation of guidelines provided by the CDC, Rose was to isolate following his medical appointments for fourteen days. He broke isolation two times and had to be re-directed to his room. Before the conclusion of the isolation period, Rose was hospitalized for a suspected stroke on July 23. He tested positive for COVID-19 from a test conducted the same day as his hospital admission.

---

[1] Rose's wife died in June 2020.

Rose passed away on August 1, 2020, at the age of seventy-one. His immediate cause of death was listed as COVID-19, with contributing factors including hypoxic respiratory failure as a result of bacterial pneumonia, septic shock, bacteremia, lactic acidosis, obesity, and diabetes. After the release of an inspection report on Oakland's COVID-19 practices by the Centers for Medicare and Medicaid Services (CMS) and local news coverage, the Roses sued Oakland for the wrongful death of their father.

The Roses alleged Oakland acted recklessly or through willful misconduct in violating "numerous regulations, laws, rights, and industry standards" resulting in Rose's death from complications of COVID-19. These allegations included "[f]ailure to provide necessary equipment to prevent the spread of COVID-19 to employees and residents," "[f]ailure to accurately document changes in the condition of the spread of COVID-19 in the facility," and "[i]nadequate training of staff regarding COVID-19 protection," among other violations of COVID-19 protocols.

Oakland moved for summary judgment, arguing COVID-19 statutory immunity under Iowa Code section 686D.6 precluded the Roses' claim and that the Roses failed to make a prima facie case that Oakland caused Rose's death. The Roses resisted, arguing that Oakland engaged in reckless behavior or willful misconduct and therefore, is not protected by statutory immunity. The court found the Roses failed to present evidence showing a genuine question of fact on recklessness and granted summary judgment for Oakland. The Roses appeal.

## II.     Standard of Review

We review the district court's order granting summary judgment for correction of errors at law.  *Banwart v. 50th St. Sports, L.L.C.*, 910 N.W.2d 540, 544 (Iowa 2018).

> A motion for summary judgment should only be granted if, viewing the evidence in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

*Otterberg v. Farm Bureau Mut. Ins. Co.*, 696 N.W.2d 24, 27 (Iowa 2005) (quoting Iowa R. Civ. P. 1.981(3)).  "A genuine issue of fact exists if reasonable minds can differ on how an issue should be resolved."  *Banwart*, 910 N.W.2d at 544 (quoting *Est. of Gottschalk v. Pomeroy Dev., Inc.*, 893 N.W.2d 579, 584 (Iowa 2017)).  And "[a] fact is material when it might affect the outcome of a lawsuit."  *Id.*  We draw all legitimate inferences from the evidence that will establish a genuine issue of material fact, but speculation is not sufficient.  *Id.* at 544–45.

## III.    Analysis

## A.     Application of Iowa Code section 686D.6

The district court granted summary judgment after finding that Iowa Code section 686D.6 provided immunity to Oakland, as the Roses failed to show sufficient facts to create a question of recklessness.  The Roses argue that the district court erred in granting summary judgment for Oakland on this basis, asserting there was sufficient evidence of recklessness presented to create a

genuine issue of material fact. Oakland disagrees and also asserts that the CMS

report relied on by the Roses is inadmissible hearsay.[2]

No party disputes the application of Iowa Code section 686D.6 to this case.

It states:

> A health care provider shall not be liable for civil damages for causing or contributing, directly or indirectly, to the death or injury of an individual as a result of the health care provider's acts or omissions while providing or arranging health care in support of the state's response to COVID-19.

Iowa Code § 686D.6(1). Despite the immunity offered by section 686D.6, there

are exceptions: "This section shall not relieve any person of liability for civil

damages for any act or omission which constitutes recklessness or willful

misconduct." *Id.* § 686D.6(2). Thus, section 686D.6 provides Oakland immunity

from liability unless it engaged in recklessness or willful misconduct. *See id.*

Seizing on this exception, the Roses argue Oakland engaged in

recklessness or willful misconduct by failing to implement proper COVID-19

prevention protocols. So we look to whether sufficient evidence exists in the record

to create a genuine issue of fact related to recklessness or willful misconduct. *See*

*Banwart*, 910 N.W.2d at 544–45.

To prove recklessness:

> a plaintiff must show that the actor has intentionally done an act of an unreasonable character in disregard of a known risk or a risk so obvious that the actor must be taken to have been aware of it and so great as to make it highly probable that harm would follow.

---

[2] Because we find section 686D.6 bars the Roses' claim, we do not address the hearsay claim related to the report authored by the CMS.

*Leonard ex rel. Meyer v. Behrens*, 601 N.W.2d 76, 80 (Iowa 1999). And "recklessness is a difficult standard to meet in Iowa." *Martinez v. State*, 986 N.W.2d 121, 125 (Iowa 2023) (quoting *Fritz v. Henningar*, 19 F.4th 1067, 1069–70 (8th Cir. 2021)). Iowa courts have been careful to separate negligence from recklessness. *See Vipond v. Jergensen*, 148 N.W.2d 598, 604 (Iowa 1967) ("[T]o allow these circumstances to raise an inference of recklessness would be allowing an inference of recklessness from every negligent act." (citation omitted)). Willful misconduct presents another avenue for recovery under section 686D.6, but similarly, "willfulness is 'characterized by intent to injure.'" *Lukken v. Fleischer*, 962 N.W.2d 71, 82 (Iowa 2021) (citation omitted).

The district court here found a reasonable jury could conclude that Oakland Manor acted negligently but could not find the requisite intent needed to satisfy the recklessness or willful misconduct standard. We agree that the Roses' failure to show intentionality in the conduct of Oakland is fatal to their case under section 686D.6.

To show recklessness, the Roses relied largely on the CMS report and also presented testimony from an expert witness affidavit. The CMS report reveals Oakland's extensive failures to comply with "CMS and [CDC] recommended practices to prepare for COVID-19," including:

> [T]he facility failed to implement a comprehensive infection control program to mitigate the risk of spread of infection during a COVID-19 outbreak. The facility failed to complete infection control surveillance consistency on residents according to CMS and CDC guidelines and failed to isolate residents for a minimum of 10 days after the presence of COVID-19 symptoms first appeared. The facility also failed to provide care in accordance with accepted infection control standards and practices. Staff did not properly sanitize the sit to stand lift after use, wore incomplete or improper

[personal protective equipment (PPE)], and failed to complete hand hygiene when indicated during resident personal care for 11 of 13 residents reviewed . . . . During the COVID-19 pandemic, 30 residents and 17 staff tested positive for COVID-19 and 7 residents died due to complications for COVID-19.

As the district court noted, compliance with some of the COVID-19 precautions "may have been imperfect." The district court highlighted that Oakland Manor committed acts including, but not limited to, failing to sanitize shared medical equipment, nonuse or improper use of PPE, and not enclosing or sealing off the isolation area. But the court noted the continued administration of care and ongoing use of PPE reflected the employees were "not intentionally acting to spread COVID-19 while caring for residents." We highlight that even a "failure to perform a statutory duty is not, alone, willful misconduct." *Vipond*, 148 N.W.2d at 603 (citation omitted). Despite some failures to properly follow COVID-19 protocols, the Roses have failed to generate a material question of fact on the intentionality necessary for the finding of recklessness. *See Leonard*, 601 N.W.2d at 80. The presented facts do not show an *intentionally* done act of unreasonable character. *See id.* And even though we view the facts in the light most favorable to the Roses, "[t]he burden to prove facts from which inferences of recklessness may be found, of course, is upon the plaintiff." *Vipond*, 148 N.W.2d at 600.

This conclusion is in line with other appellate court decisions outside of Iowa in applying similar recklessness exceptions in COVID-19 immunity statutes and the standard for recklessness. *See, e.g.*, *Arbor Mgmt. Servs., LLC v. Hendrix*, 875 S.E.2d 392 (Ga. Ct. App. 2022); *Brady v. SSC Westchester Operating Co. LLC*, 533 F. Supp. 3d 667 (N.D. Ill. 2021); *Hasan v. Terrace Acquisions II, LLC*, 194 N.Y.S.3d 445 (N.Y. Sup. Ct. 2023); *Crampton v. Garnet Health*, 155 N.Y.S.3d 699

(N.Y. Sup. Ct. 2021). Responses to the COVID-19 protocols by care facilities that were "belated and fell short" or amounted to "acting in a way that no prudent person would" do not satisfy a willful-misconduct standard. *Hendrix*, 875 S.E.2d at 400. In *Hendrix*, the Georgia Court of Appeals held that failing to enforce outside visitor restrictions, failing to ensure use of masks or other PPE, allowing asymptomatic exposed staff to work, and hosting a non-social distanced social event at the onset of the pandemic did *not* satisfy the "gross negligence, willful and wanton misconduct, [and] reckless infliction of harm" exception to Georgia's analog to Iowa Code chapter 686D. *See id.* at 399–400 (citing Ga. Code § 51-16-2(a)).

The Roses also rely on a statement from their expert witness, a registered nurse with experience in long-term care, which states, "the death of Jack F. Rose is due to the negligent care and wanton violation of . . . regulations regarding the prevention of [COVID-19]." Our supreme court has determined that the testimony of an expert witness on recklessness can be sufficient to avoid summary judgment. *Feld v. Borkowski*, 790 N.W.2d 72, 80–81 (Iowa 2010) (finding an affidavit from a long-time baseball coach asserting the strange release of a baseball bat was a deliberate "contorted act of recklessness" supported a jury question on recklessness). Wantonness and recklessness are related concepts. *Vipond*, 148 N.W.2d at 601 ("Recklessness may include willfulness or wantonness, but if the conduct is more than negligence it may be reckless without being willful and wanton.").

But in this case, the expert's statement did not offer the detailed explanation of recklessness offered by the expert in *Feld*. In *Feld*, the expert used testing and experience to explain in detail how the defendant's conduct was reckless:

In his experience as a player and coach, Servais had never seen or even heard of a first baseman being hit by a bat released from the hands of a right-handed hitter who had hit the pitched ball to the left side of the third baseline. Moreover, Servais attempted to duplicate such an occurrence without success, which led him to the conclusion that Borkowski must have deliberately released the bat in a very abnormal, contorted act of recklessness.

*Feld*, 790 N.W.2d at 80. Here, the expert witness simply recounted some of the information in the CMS report and stated, "the death of Jack F. Rose is due to the negligent care and wanton violation of . . . regulations regarding the prevention of [COVID-19]." This statement, lacking in detail, was insufficient to create the question of fact created by the expert testimony in *Feld*. *See id.* at 80–81.

No genuine issue of material fact on recklessness exists.

## B.      Causation

Although not addressed by the district court or either party in the appellate briefing, we turn to an alternate ground to affirm the district court ruling granting summary judgment. A review of the record demonstrates that the Roses have failed to present sufficient evidence to create a question for the jury as to the causation of Rose's death. The Roses must make a prima facie showing that Oakland caused Rose's death. *Est. of Butterfield v. Chautauqua Guest Home, Inc.*, 987 N.W. 834, 839 (Iowa 2023). Oakland argued the causation issue before the district court. "[W]e may affirm the summary judgment ruling on a proper ground urged below but not relied upon by the district court." *Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 662 (Iowa 2008). This is because "the preservation requirement ordinarily should apply only to an unsuccessful party." *Johnston Equip. Corp. of Iowa v. Indus. Indem.*, 489 N.W.2d 13, 17 (Iowa 1992).

And "[o]ur cases are legion which hold that a trial court may be affirmed on grounds upon which it does not rely."  *Id.*

Although Oakland does not raise the issue of causation on appeal, we may still affirm on that basis.[3]  *See King v. State*, 818 N.W.2d 1, 11 (Iowa 2012) ("In any event, because both grounds were duly raised before the trial court, we could affirm on either ground even if it were not argued to us.").  Our decision to decide on an issue presented to the district court, but not argued on appeal, is discretionary.  *See id.* ("Of course, we may choose to consider only grounds for affirmance raised in the appellee's brief, but we are not required to do so, so long as the ground was raised below."); *Ruiz v. State*, 912 N.W.2d 435, 441 (Iowa 2018) ("However, since Hernandez Ruiz is the appellee and article I, section 10 was preserved below, we have discretion to address it and will proceed to do so.  'We

---

[3] We acknowledge language in previous opinions exists which suggests, in this context, an appellee must raise an issue on appeal for us to affirm based on that issue.  *Veatch v. City of Waverly*, 858 N.W.2d 1, 7 (Iowa 2015) ("Nonetheless, we can affirm the summary judgment on a ground not relied upon by the district court provided the ground was urged in that court and is also urged on appeal."); *Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 97 (Iowa 2012) ("If we reverse a district court's decision to grant summary judgment on one ground, however, we may still affirm the ruling on alternative grounds raised but not ruled on below and subsequently urged on appeal.").

That said, the case law on this issue is conflicted, and other cases state no such requirement.  *Kern*, 757 N.W.2d at 662 ("Although the district court did not determine whether any of the individual defendants' alleged actions were improper, we may affirm the summary judgment ruling on a proper ground urged below but not relied upon by the district court."); *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 774–75 (Iowa 2009) ("An erroneous decision by the district court can be affirmed on appeal based on a different ground that was properly raised at trial."); *Krohn v. Jud. Magistrate Appointing Comm'n*, 239 N.W.2d 562, 563 (Iowa 1976) ("However we may affirm the ruling on a proper ground urged but not relied upon by the trial court.").

But because we find this is an issue of appellate discretion, we choose to address causation.  *See King*, 818 N.W.2d at 11–12.

have discretion to affirm the district court on grounds raised at trial but not on appeal.'" (citation omitted)). Considering the issue of causation is determinable to us now, and remand would merely waste judicial resources, we choose to address causation. *See King*, 818 N.W.2d at 11 ("[A] remand for [the district court] to rule again on the viability of those claims (assuming their justiciability) seems particularly unnecessary and would only prolong the proceedings.").

To survive summary judgment, the Roses must show there is a question for the jury on the causation of Rose's death. Did Oakland's actions cause Rose to contract COVID-19, which resulted in Rose's death? "In a negligence cause of action, the plaintiff must prove causation." *Garr v. City of Ottumwa*, 846 N.W.2d 865, 869 (Iowa 2014). In medical cases, expert testimony can be required to establish causation: "Expert testimony is required to create a jury question on causation when the causal connection 'is not within the knowledge and experience of an ordinary layperson.'" *Susie v. Fam. Health Care of Siouxland, P.L.C.*, 942 N.W.2d 333, 337 (Iowa 2020) (quoting *Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 793 (Iowa 2009)). Further, speculation by the expert as to causation is not enough. *Id.* "The evidence must show the plaintiff's theory of causation is 'reasonably probable—not merely possible, and more probable than any other hypothesis based on such evidence.'" *Doe*, 766 N.W.2d at 793 (quoting *Ramberg v. Morgan*, 218 N.W. 492, 497 (Iowa 1928)). Ultimately, "expert testimony indicating *probability* or *likelihood* of a causal connection is sufficient to generate a question on causation." *Hansen v. Cent. Iowa Hosp. Corp.*, 686 N.W.2d 476, 485 (Iowa 2004).

The causation of a COVID-19 infection is the sort of medical condition necessitating expert testimony on causation; the transmission of COVID-19 is not within the knowledge of a layperson. *See Susie*, 942 N.W.2d at 337; *Doe*, 766 N.W.2d at 793 (contrasting a throat incision and bleeding, where a layperson would understand causation, with multiple falls and multiple back injuries, where a layperson would be unable to determine which fall caused which injury without the aid of expert testimony). Although the issue of COVID-19 transmission and expert testimony on causation has not been addressed in Iowa, some federal courts have found expert testimony necessary in cases involving COVID-19. *See, e.g.*, *Roberts v. Phila. Express Tr.*, No. 4:20-CV-236, 2024 WL 1473756, at *4 (S.D. Ga. Feb. 26, 2024) ("Accordingly, because COVID-19 is an internal, respiratory illness, it is not readily apparent to a lay person and requires expert testimony to show causation."); *Toutounchian v. Princess Cruise Lines, Ltd.*, No. CV203717DSFAGRX, 2022 WL 2783837, at *6 (C.D. Cal. June 13, 2022) ("Without any evidence or expert testimony as to where or when Plaintiffs contracted COVID-19, their contentions are mere speculation."). Considering that the transmission of an infectious disease is not obvious to a regular layperson, and that Rose could have contracted COVID-19 from sources other than Oakland, expert testimony on causation was necessary here. *See Doe*, 766 N.W.2d at 793.

After an offsite hospitalization in June 2020, Rose returned to Oakland and was placed in isolation for fourteen days until July 8. He tested negative for COVID-19 on July 7. Rose attended two off-site medical appointments on July 10 and July 13. He was to remain in isolation until July 27. But on July 23, Rose was again hospitalized for a suspected stroke. He tested positive for COVID-19 on the

date of his hospitalization, July 23. Rose died on August 1. Considering this timeline, the expert testimony presented is not sufficient to establish causation beyond mere speculation.

The Roses' expert witness, a registered nurse with experience working in long-term care facilities, offered a statement opining: "Based on my education, experience, and qualifications it is my professional opinion that the death of Jack F. Rose is due to the negligent care and wanton violation of Federal, State and facility regulations regarding the prevention of COVID-19." The expert's statement also offered a summary of Oakland's failures established in the CMS reports before concluding the facility's improper use of PPE "was the cause of contracting COVID-19 and the death of Jack M. Rose." The expert's sparse statement, consisting of only conclusive statements with little to no explanation of the link between Oakland's behavior and Rose's illness, including no explanation of when or where Rose contracted COVID-19, is insufficient to establish the probability necessary for a jury question. *See Harris v. Select Specialty Hosp. - Quad Cities, Inc.*, No. 22-1908, 2023 WL 8449567, at *6 (Iowa Ct. App. Dec. 6, 2023) (finding an expert's testimony must show the link between the defendant's behavior and the harm: that the victim probably would have lived but for the conduct of the defendant).

And a designated expert must have the qualifications necessary to render an opinion on causation, and it is unclear from the appellate record that the designated expert has such qualifications. *See Susie*, 942 N.W.2d at 337 ("To begin, it is unclear whether [the expert] is qualified to render a causation opinion. He testified he is not an expert in the treatment of necrotizing fasciitis and he is not

a surgeon nor an infectious disease specialist.").  The expert here is a registered nurse, not an epidemiologist or an expert in infectious diseases.  Neither her statement nor her CV details her specific qualifications for rendering an opinion on infectious diseases, including COVID-19.

For the above reasons, we affirm the grant of summary judgment.

**AFFIRMED.**

Greer, J., concurs; Tabor, C.J., dissents.

**Tabor, Chief Judge (dissenting).**

I respectfully dissent. During the COVID-19 pandemic, all but one of Oakland Manor's thirty-one residents tested positive for the virus and seven died from complications of the disease. Jack Rose was one of the residents who died. Because his Estate generated a jury question whether the nursing facility's blatant disregard of infection control standards was reckless, I would reverse the grant of summary judgment.

Oakland Manor contends that recklessness is a difficult standard to meet in Iowa. Indeed, our supreme court has described the standard of recklessness as a "high bar." *See Penny v. City of Winterset*, 999 N.W.2d 650, 656 (Iowa 2023) (analyzing Iowa Code section 321.231(5) on emergency vehicle liability). But recklessness is not the highest rung on the mens rea ladder. In another civil context, our supreme court has distinguished between the "high bar" set by the legislature for plaintiffs to show a director's *intent to harm* the corporation rather than mere recklessness or dereliction in performing their duties. *Meade v. Christie*, 974 N.W.2d 770, 779 (Iowa 2022) (analyzing director-shield statute at Iowa Code section 490.202(2)). And in the criminal context, the Model Penal Code recognizes four ascending steps of culpability, starting from negligent to reckless to knowing and finally to purposeful. *See* Model Penal Code § 2.02 (defining general requirements of culpability).

Two levels of culpability appear in Iowa Code section 686D.6. It creates an exception to the immunity enjoyed by health care providers if their acts or omissions constituted *either* willful misconduct *or* recklessness. The higher bar is willful misconduct—requiring an intent to do wrong and an evil purpose on the

accused's part. *See Babka v. Iowa Dep't of Inspections & Appeals*, 967 N.W.2d 344, 355 (Iowa Ct. App. 2021); *see also Lukken v. Fleischer*, 962 N.W.2d 71, 82 (Iowa 2021) (characterizing willfulness as "intent to injure"). By contrast, recklessness "embraces the concept of conduct 'consciously done with willful disregard of the consequences' but 'is not intentional in the sense that harm is intended to result.'" *State v. Thompson*, 570 N.W.2d 765, 769 (Iowa 1997) (citations omitted).

Blurring those two concepts, the majority finds that summary judgment was justified based on the Estate's "failure to show intentionality in the conduct of Oakland." But to show recklessness, the Estate did not need to prove that employees of Oakland Manor committed "an intentional wrong"—that is, failed to follow safety protocols with the aim to expose residents to the risks of COVID-19. *See State v. Conyers*, 506 N.W.2d 442, 444 (Iowa 1993) (citation omitted). It was enough for the estate to prove that the health care providers engaged in "*highly* unreasonable conduct" in a "*foreseeably* dangerous" situation. *State v. Sutton*, 636 N.W.2d 107, 112 (Iowa 2001).

And the Estate made that showing at the summary-judgment stage. It submitted a report[4] from the Centers for Medicare and Medicaid Services (CMS) finding that the facility and its staff

- failed to implement a comprehensive infection control program to mitigate the risk of spread of infection during a COVID-19 outbreak;

---

[4] Oakland Manor contends that the report was inadmissible hearsay and cannot save the estate from summary judgment. In its reply brief, the Estate argues that the findings are admissible as a public record under Iowa Rule of Evidence 5.803(8). Because evidence need not be in an admissible form at the summary judgment stage, the hearsay question is not ripe for our review. *See Kindig v. Newman*, 966 N.W.2d 310, 322 (Iowa Ct. App. 2021).

- failed to complete infection control surveillance consistently on residents according
to guidelines from CMS and the Centers for Disease Control and Prevention;
- failed to isolate residents for at least ten days after COVID-19 symptoms first appeared;
- failed to provide care in accordance with  accepted infection control standards and practices;
- failed to properly sanitize the sit-to-stand lift after each use;
- wore incomplete or improper personal protective equipment; and
- failed to consistently complete hand hygiene.

Those failures saddled the facility with an "immediate jeopardy" rating—meaning that its noncompliance placed the residents in its care at risk of serious harm or death.  Yet the majority downplays the sweeping failure of the facility to follow COVID-19 protocols to protect its vulnerable residents while simultaneously inflating the level of "intentionality" necessary to show recklessness.

The majority also expects too much specificity from the Estate's expert at the summary-judgment stage.  The record shows that Nurse Mincer was prepared to testify that, based on her years of experience in long-term care, and after reviewing the federal report, she believed that Jack Rose's death was due to Oakland Manor's "wanton violation" of federal, state, and facility regulations regarding the prevention of COVID-19.  Her expert view adequately supported a jury question on recklessness.  *See Feld v. Borkowski*, 790 N.W.2d 72, 81 (Iowa 2010).  We must afford the Estate, as the party resisting summary judgment, "every legitimate inference that can reasonably be deduced from the evidence."  *See id*.  At this stage, it is not our job to say whether the facility was reckless, but whether reasonable minds, like those on a jury, might so conclude.  *See Oehlert v. Kramer*, 205 N.W.2d 723, 725 (Iowa 1973).

Finally, I disagree with the majority's decision to reach an issue not decided by the district court nor briefed by either party. On its own accord and without any guidance, the majority declares that the Estate failed to present sufficient evidence to create a jury question about the cause of Rose's death. True, sometimes we may decide issues left unaddressed by the district court. *See Barnes v. Iowa Dep't of Transp.*, 385 N.W.2d 260, 263 (Iowa 1986). But when the parties have not briefed or argued such an issue, it is not "in the interest of sound judicial administration" for us to decide it in on our own. *See Rivera v. Clear Channel Outdoor, LLC*, 7 N.W.3d 734, 739 (Iowa 2024) (citation omitted). Instead, the causation issue should be decided by the district court on remand from reversal of the summary-judgment ruling on the recklessness ground.